NATURAL GAS PIPELINE COMPANY OF AMERICA, MidCon Gas Services Corp., and Chesapeake Panhandle Limited Partnership

v.

Joseph H. POOL, et al. (Two Cases).

Nos. 01–0057, 01–0058.

Supreme Court of Texas.

Argued March 6, 2002.

Decided Dec. 19, 2003.

Dissenting Opinion Originally Filed Aug. 28, 2003, which was not Withdrawn on Denial of Rehearing.

W. Alan Wright, Maston C. Courtney, Hinkle, Hensley, Shanor & Martin, L.L.P., Amarillo, Bruce M. Kramer, Jesse R. Pierce, Clements, O'Neill, Pierce, Wilson & Fulkerson LLP, Houston, for petitioner.

Edward H. Hill, Don M. Dean, Underwood, Wilson, Berry, Stein & Johnson, P.C., Joe L. Lovell, Lovell, Newson & Isem, L.L.P., Amarillo, William C. Boyd, Patterson Boyd & Lowery PC, Houston, J.R. Lovell, Lovell & Lyle, Louis T. Dubuque, Dumas, Anthony Atwell, Burdin Mediation, Dallas, Mullin Hoard & Brown, L.L.P., Lubbock, for respondent.

James W. McCartney, Mark L. Withrow, Pioneer Natural Resources, Midland, Jeffery L. Hart, Cardwell and Bennett, Austin, Everard A. Marseglia, Jr., Burns, Wooley & Marseglia, L.L.P., Houston, for amicus curiae.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice SCHNEIDER, Justice SMITH, and Justice WAINWRIGHT joined.

We deny Respondents' motion for rehearing. We withdraw our opinion of August 28, 2003, and substitute the following in its place.

In these consolidated proceedings, lessors under three oil and gas leases contend

that the leases terminated because intermittently over the years there were periods of time ranging from 30 to 153 days when there was no actual production. We do not decide whether the leases terminated because even assuming they did, the lessees thereafter acquired by adverse possession fee simple determinable interests in the mineral estates that are identical to those the lessees held under the leases. Accordingly, we reverse the judgments of the court of appeals and render judgments for petitioners.

I

Two separate suits were brought in the same trial court by the same lessors against the same defendants. The first suit involved two leases; the second suit involved a third lease. The cases were not consolidated in the trial court or the court of appeals, and the court of appeals issued an opinion in each case.[1] We consolidated the cases in this Court. For ease of reference, we will refer to the first-filed suit as *Pool 1*,[2] and the second as *Pool 2*.[3]

In *Pool 1*, two leases were executed by J.T. Sneed and his wife in 1926 and 1936, respectively. In a separate agreement, the leases were consolidated as to a portion of the lands they covered for purposes of natural gas exploration and production. The 1926 lease at issue in *Pool 1* provided it would remain in effect for a term of ten years and "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The 1936 lease similarly provided that it would remain in effect "so long as natural gas is produced."

A well, known as the J.T. Sneed #1 well, was drilled on the consolidated acreage, and it produced gas until a replacement well was drilled in 1994. The

replacement well has produced without interruption. But according to records from the Texas Railroad Commission, there were periods of time when there was no production from the J.T. Sneed #1. Those periods were in August 1941, June through September 1963, July and August 1964, June 1979, March 1983, and July 1984. There is evidence that the J.T. Sneed #1 did not produce for 122 consecutive days in the summer of 1963 and for 62 consecutive days in 1964. The other periods of non-production were shorter.

The lease at issue in *Pool 2* was executed in 1937. It provided that "[s]ubject to the other provisions herein contained, this lease shall remain in force pending the commencement and continuation of drilling operations on said land as hereinafter provided, and as long thereafter as natural gas is produced and marketed from any well on said land."

Two producing wells were drilled on the acreage covered by the lease at issue in *Pool 2*. However, there was no actual production from either of these wells in August 1959, July and August 1960, June and July 1961, June through October 1963, July and August 1964, and June 1969. The periods of no actual production ranged from 30 to 153 days. Another well was drilled on the *Pool 2* lease in 1996, and it has produced in paying quantities without interruption.

The plaintiffs in the trial court, who are the respondents in this Court, are the successors of the Sneeds' interests in all three leases, and they contend that the leases terminated due to cessation of production. They brought suit to quiet title, for trespass, conversion, and fraud, and for

---

1. 30 S.W.3d 618; 30 S.W.3d 639.

2. 30 S.W.3d 639.

3. 30 S.W.3d 618.

actual and exemplary damages. The defendants in the trial court, who are the petitioners in this Court, are Natural Gas Pipeline Company of America, MidCon Gas Services Corp., and Chesapeake Panhandle Limited Partnership. They are the current owners and operators of the leases. For simplicity, we will refer to them as the lessees. They contend that the leases did not terminate because there has been production in paying quantities at all times, notwithstanding the periods of non-production, or that production was restored within a reasonable period of time under the temporary cessation of production doctrine. In the alternative, the lessees contend that the lessors' claims are barred by laches, or that the lessees obtained a fee simple determinable in each of the mineral estates by adverse possession.

In both suits, the trial court granted motions for partial summary judgment in favor of the lessors, declaring in the partial summary judgment that the leases had terminated "due to one or more cessations of production from said land." The trial court then tried the remaining issues in *Pool 1* to a jury. In a verdict largely favorable to the lessees, the jury found that the lessees had produced gas in good faith after August 1964 and failed to find that the lessees had produced gas after 1964 as a result of fraud. The jury also found that the lessees' failure to produce gas was excused because the lessors were guilty of laches, and that the lessees had acquired title to the leases by adverse possession under the three-, five-, ten-, and twenty-five-year statutes of limitations. However, the jury found that the lessors had not executed any formal document

that expressly recognized the validity of the leases and thus that the leases had not been revived. The trial court rendered judgment notwithstanding the aspects of the verdict that were favorable to the lessees. The trial court declared that the two leases had terminated, and based on stipulated damage calculations, awarded $234,766.20 in actual damages to be paid by Natural Gas Pipeline and MidCon, and $545,416.79 in actual damages to be paid by Chesapeake Panhandle.[4] The trial court also awarded attorneys' fees and costs to the lessors.

The trial court tried the remaining issues in *Pool 2* to a different jury in a trial that began a few days after the conclusion of the *Pool 1* trial. Unlike the jury in *Pool 1*, the jury in *Pool 2* rendered a verdict that was entirely favorable to the lessors. The jury found that the lessees had acted in bad faith in producing gas after August 1964, that the lessees produced gas after that date as a result of fraud, that the lessors were not guilty of laches, that the lessees did not acquire title by adverse possession, and that the lessors had not executed any formal document that expressly recognized the validity of the lease and thus that the lease had not been revived. The trial court rendered a judgment declaring that the lease had terminated, that the lessees were jointly and severally liable for $1,522,754.93 in actual damages, that the lessors recover exemplary damages of $1,200,000 from Natural Gas Pipeline Co., $1,200,000 from MidCon and $1,200,000 from Chesapeake Panhandle, and awarded attorneys' fees, costs, and prejudgment interest.

---

**4.** The lessees contended in the court of appeals that the damages awarded represented the amounts they had received for 7/8 of the gas produced, plus transportation costs, from a date four years before suit was filed until trial. The lessees argued that damages should have been calculated from only two years before suit was filed. The lessors contended, and the court of appeals held, that the stipulated amount correctly included damages from only two years before suit was filed. 30 S.W.3d at 648.

The lessees appealed both judgments. In *Pool 1*, the court of appeals held that the leases had terminated due to cessation of production, the lessees could not establish adverse possession even if they were trespassers because they had not given notice of repudiation of the lessors' title, laches was not a defense, the lessors were not entitled to attorneys' fees because the suit was essentially a trespass to try title action rather than an action for declaratory judgment, and certain offsets should be applied to reduce damages. The court of appeals accordingly modified and then affirmed the trial court's judgment.[5]

In *Pool 2*, the court of appeals held that the lease had terminated due to cessation of production, laches was unavailable as a defense, the lessors' execution of division orders did not revive the lease, the lessees did not establish adverse possession because there was no notice to the lessors that the lessees repudiated the lease, the evidence did not support the fraud finding and therefore exemplary damages were not recoverable, the evidence supported the finding that the lessors had produced gas in bad faith, the two-year limitations periods applied to the trespass and conversion claims for recovery of actual damages, and the lessors could not recover attorneys' fees. The court of appeals affirmed the trial court's judgment as modified.[6]

We granted the lessees' petitions for review. Because the lessees established adverse possession as a matter of law, and resolution of that issue is dispositive, we do not reach other issues presented by the lessees' petitions.

## II

In Texas it has long been recognized that an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property.[7] In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee.[8] Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor.[9] The lessee's/grantee's interest is "determinable" because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate.[10] In the cases before us today, the lessors retained only a royalty interest. When an oil and gas lease reserves only a royalty interest, the lessee acquires title to all of the oil and gas in place, and the lessor owns only a possibility of reverter and has the right to receive royalties.[11] A royalty interest, as distinguished from a mineral interest, is a non-possessory interest.[12]

A mineral estate, even when severed from the surface estate, may be

5. 30 S.W.3d at 652–53.

6. 30 S.W.3d at 638–39.

7. *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex.1982).

8. See *W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27, 28–29 (1929).

9. *Id.*

10. *Id.; Cherokee Water Co.,* 641 S.W.2d at 525.

11. See *W.T. Waggoner Estate,* 19 S.W.2d at 28; see also Walker, *Fee Simple Ownership of Oil and Gas in Texas,* 6 TEX. L.REV. 125, 128–29 (1928).

12. *Concord Oil Co. v. Pennzoil Exploration and Prod. Co.,* 966 S.W.2d 451, 459 (Tex. 1998); see also Walker, *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas,* 7 TEX. L.REV. 539, 547–48 (1929).

adversely possessed under the various statutes of limitations.[13] Once severance occurs, possession of the surface alone will not constitute adverse possession of minerals.[14] Generally, courts across the country including Texas courts have said that in order to mature title by limitations to a mineral estate, actual possession of the minerals must occur.[15] In the case of oil and gas, that means drilling and production of oil or gas.[16]

In order to acquire title under a statute of limitations, that statute's requirements must be met. In these cases, we consider the three-, five-, and ten-year statutes of limitations. Suit was filed in both cases more than ten years after the last cessation of actual production. The last period of nonproduction occurred in 1984 in *Pool 1* and in 1969 in *Pool 2*. Both suits were filed in 1998.

The three-year statute of limitations says: "A person must bring suit to recover real property held by another in peaceable and adverse possession under title or color of title not later than three years after the day the cause of action accrues."[17] The five-year statute says,

(a) A person must bring suit not later than five years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who:

(1) cultivates, uses, or enjoys the property;

(2) pays applicable taxes on the property; and

(3) claims the property under a duly registered deed.[18]

The jury in this case was instructed that "an oil and gas lease is to be considered as a deed." The ten-year statute of limitations requires suit to be brought within ten years "to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property."[19]

"Adverse possession" is defined in the Civil Practice and Remedies Code as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."[20] "Peaceable possession" is defined as "possession of real property that is continuous and is not interrupted by an adverse suit to recover the property."[21]

13. *See Hanks v. Magnolia Petroleum Co.*, 14 S.W.2d 348, 354 (Tex.Civ.App.-Eastland 1928), *aff'd*, 24 S.W.2d 5 (Tex. Comm'n App. 1930, judgm't adopted) (holding on rehearing that title to an oil and gas leasehold had been acquired by adverse possession under the five-year statute of limitations); *Lyles v. Dodge*, 228 S.W. 316, 317 (Tex.Civ.App.-Amarillo 1921, no writ); *Wallace v. Hoyt*, 225 S.W. 425, 426 (Tex.Civ.App.-Austin 1920, writ ref'd); *see also Mohoma Oil Co. v. Ambassador Oil Corp.*, 474 P.2d 950, 960 (Okla.1970).

14. *See Elliott v. Nelson*, 113 Tex. 62, 251 S.W. 501, 504 (Tex.Comm.App.1923).

15. *See Hunt Oil Co. v. Moore*, 656 S.W.2d 634, 641 (Tex.App.-Tyler 1983, writ ref'd n.r.e.); *Lyles*, 228 S.W. at 318 (citing *Gill v. Fletcher*, 74 Ohio St. 295, 78 N.E. 433 (1906)

and *Gordon v. Park*, 202 Mo. 236, 100 S.W. 621 (1907)); *Mohoma Oil Co.*, 474 P.2d at 960; *Hope Land Mineral Corp. v. Christian*, 225 Mich.App. 43, 570 N.W.2d 268, 271 (1997); *Thomas v. Rex A. Wilcox Trust*, 185 Mich.App. 733, 463 N.W.2d 190, 192 (1990).

16. *See generally Hunt Oil Co.*, 656 S.W.2d at 641.

17. TEX. CIV. PRAC. & REM.CODE § 16.024.

18. *Id.* § 16.025(a).

19. *Id.* § 16.026(a).

20. *Id.* § 16.021(1).

21. *Id.* § 16.021(3).

The court of appeals concluded in these cases that the lessees' continuation of oil and gas operations and possession of the minerals after the leases terminated [22] was not adverse because no notice of repudiation had been given to the lessors. The court reasoned in *Pool 2* that because the lessees' original possession of the mineral estate was permissive, adverse possession could not be established "unless notice of the hostile nature of the possession or repudiation of [the record title owners'] title is clearly manifested." [23] The court of appeals employed similar reasoning in *Pool 1*.[24]

■ We first consider the relationship between the parties, which guides us in determining whether the lessees' possession was adverse. The parties to the leases were not co-tenants. As discussed above, the lessors retained only a royalty interest and the possibility of reverter. The lessors had no right to possess, explore for, or produce the minerals. The exclusive right to do so was conveyed to the lessees. Accordingly, even when the lease was in effect, there was no co-tenancy.[25] More importantly, if the leases terminated as the lessors contend, the lessees retained no interest whatsoever in the minerals. The entire mineral interest reverted to the lessors. There was no co-tenancy.

A lessee's position after a lease expires is more analogous to one holding over after the execution of a deed or after a judgment vesting title in another is entered. We have long said that "as a general rule, a party holding over after the execution of a deed or the rendition of an adverse judgment is merely a permissive tenant." [26] In such circumstances, "possession cannot be considered adverse until the tenancy has been repudiated, and notice of such repudiation has been brought home to the titleholder." [27] But we have said that actual notice of repudiation is not required. Rather, notice can be inferred, or there can be constructive notice.[28]

This Court held in *Tex–Wis Co. v. Johnson* that a "jury [may] infer notice of a repudiation without any change in the use of the land," if there has been "long-continued use." [29] In *Tex–Wis*, the Court cited some of its early decisions to that effect. One of those decisions was *Vasquez v. Meaders*.[30] This Court said in that case:

It is not necessary that actual notice of adverse claim and disseisin be given to the landlord. It is sufficient if constructive notice is given, and constructive notice will be presumed where the facts show, as they do in this case, that the adverse occupancy and claim of title to the land involved in this suit has been long continued, open, notorious, exclusive and inconsistent with the existence of title in the respondent.[31]

The Court also quoted at length from the decision in *Mauritz v. Thatcher*:

22. We reiterate that we do not reach whether the court of appeals correctly held that the leases had terminated.

23. 30 S.W.3d at 629.

24. 30 S.W.3d at 644–45.

25. *See In re Bass,* 113 S.W.3d 735 (Tex.2003).

26. *See, e.g., Tex–Wis Co. v. Johnson,* 534 S.W.2d 895, 899 (Tex.1976) (citing *Sweeten v. Park,* 154 Tex. 266, 276 S.W.2d 794 (1955)

and *Kidd v. Young,* 144 Tex. 322, 190 S.W.2d 65 (1945)).

27. *Id.*

28. *Id.*

29. *Id.*

30. 156 Tex. 28, 291 S.W.2d 926 (1956).

31. *Id.* at 928.

It is the settled law in this state that a tenant cannot dispute the title of his landlord by setting up a title either in himself or in a third person during the existence of his tenancy until such notice of a termination thereof is given to the landlord as amounts to an actual disseizin. Limitation upon an adverse possession in a case of this kind begins to run from the time of such notice of a termination of tenancy. It is not necessary, however, that actual notice of an adverse holding and disseizin be given to a co-tenant or owner. Such notice may be constructive and will be presumed to have been brought home to the co-tenant or owner when the adverse occupancy and claim of title to the property is so long-continued, open, notorious, exclusive and inconsistent with the existence of title in others, except the occupant, that the law will raise the inference of notice to the co-tenant or owner out of possession, or from which a jury might rightfully presume such notice.[32]

This Court had articulated the same principles even earlier in *Moore v. Knight*.[33] The Court also said in *Moore* that the failure of the record titleholder to assert a claim during long-continued possession was highly significant from an evidentiary perspective: "Long-continued possession and assertion of claim by one tenant with nonclaim on the part of one out of possession has always been regarded as a strong circumstance tending to authorize an inference of notice of the adverse possession."[34]

In this case, the lessors asserted no claim for at least fourteen years with regard to the *Pool 1* leases, and for at least twenty-nine years with regard to the *Pool*

2 lease. That is a strong circumstance tending to authorize an inference of notice of adverse possession. There is also uncontroverted evidence that the lessees' long-continued possession was "open, notorious, exclusive, and inconsistent with the existence" of title to all the minerals in the lessors.

It is important to bear in mind that the lessees were not required to give actual or constructive notice that they were no longer claiming an interest under the leases, but instead that they were claiming an interest that was inconsistent with the lessors' title to all the minerals when the leases expired. Thus, it was not the leases that the lessees must have been adverse to, but the lessors' fee title to all the minerals after the leases allegedly terminated. The lessees continued to claim rights under the leases, and it was that claim that was adverse to the lessors' fee title, unencumbered by the leases.

It is also important to recognize that the holding over of an oil and gas lessee after the lease has expired can differ from a tenant of the surface with regard to what is "open, notorious, exclusive, and inconsistent." A tenant of the surface that holds over and does nothing more than continue to occupy the premises as before, paying the same rent as before, is not in the same position as an oil and gas lessee who holds over. Surface leases do not typically contemplate that the tenant will remove permanent fixtures on or improvements to the property or consume or destroy the property itself. But an oil and gas lease contemplates that the mineral estate itself may be permanently and irrevocably depleted by removing and exhausting the

32. *Id.* at 929 (quoting *Mauritz v. Thatcher*, 140 S.W.2d 303, 304 (Tex.Civ.App.-Galveston 1940, writ ref'd)).

33. 127 Tex. 610, 94 S.W.2d 1137, 1139–40 (1936).

34. *Id.* at 1140.

minerals. An oil and gas lessee that holds over continues to physically remove and dispose of the very valuable, non-renewable minerals for its own account. Such actions are by their nature hostile to the lessor's ownership of all the minerals in place once the lease expires and the mineral estate reverts to the lessor in its entirety.

In both of the cases before us, the court of appeals relied on a decision from this Court, *Killough v. Hinds*.[35] In the *Killough* case, Hinds acquired an oil and gas lease on forty acres of land, the surface of which was owned by the Killoughs or their predecessors. Hinds and his wife were given permission by the surface owners to construct a home on the property. Hinds later sold his interest in the oil and gas lease to a third party, but he and his wife continued to live on the surface of the property. This Court held that Hinds had failed to establish title to the surface under the ten-year statute of limitations because "the erection of the barn, pig pen, chicken house and the grazing of milk cows, all of which were relied on to show adverse possession," were not "inconsistent with the permissive use and the right by which Hinds entered upon and occupied the property and built his residence, nor are they sufficient as a matter of law to afford the record owner constructive notice of a repudiation of that permissive use."[36]

In *Killough* we relied on and quoted from an earlier decision of this Court, *Evans v. Templeton*,[37] in explaining "the character of evidence necessary to show constructive notice of repudiation to the record owner."[38] Quoting *Evans*, we said:

In order to make the plea of limitation effectual in such case, he must show some notorious act of ownership over the property, distinctly hostile to the claim of the grantee; and the adverse possession after this must continue for a sufficient length of time before suit to complete the statutory bar. The "possession must not only be actual, but also visible, continuous, notorious, distinct and hostile, and of such a character as to indicate unmistakably an assertion of claim of exclusive ownership in the occupant."[39]

There is evidence of a "notorious act of ownership over the property, distinctly hostile to the claim of the" lessors that "indicate[s] unmistakably an assertion of claim of exclusive ownership" to show notice in the cases before us today. Assuming that the leases terminated because of cessation of actual production, an issue that we again note we are not deciding, the character of the lessors' real property interests changed dramatically and instantaneously, as did the lessees' interests, as we have explained above. The lessors had owned a mere possibility of reverter in the respective mineral interests as long as the leases covering those interests remained in effect. The lessors had no right to possess or explore for minerals. That right had been granted in toto to the lessees. The lessees had the right to explore for and remove all of the oil and gas from the premises, subject only to the obligation to pay royalties on the oil and gas that was actually produced. And if the lessees did not properly account to the lessors for that royalty, the leases would not terminate. The lessors would be relegated to bringing suit to recover the unpaid royalties. As

35.  161 Tex. 178, 338 S.W.2d 707 (1960).

36.  *Id.* at 710.

37.  69 Tex. 375, 6 S.W. 843 (1887).

38.  *Killough,* 338 S.W.2d at 711.

39.  *Id.*

long as the leases continued in effect, the lessees were entitled to recover and sell one hundred percent of the oil and gas, to the point of totally exhausting those valuable resources. Once the leases terminated, the lessees had no right to explore for, produce, or sell any of the oil and gas, much less one hundred percent of all that was produced. Those rights reverted to the lessors. Thereafter, it was the lessors that had the exclusive right to all the proceeds from production, subject only to an equitable accounting to the former lessees for the actual cost of production.

■ After the leases allegedly terminated, the lessees' continued production and sale of all the oil and gas and payment of royalty on only a relatively small percentage of the proceeds was open, notorious, and hostile to the lessors, who received payments each month of only a 1/8 royalty for more than ten years after they say the leases terminated.[40] Moreover, the lessees drilled new wells after the time the lessors contend the leases terminated. The act of drilling wells is an act hostile to the lessors' exclusive right to explore for and remove the valuable minerals as well as the lessors' exclusive right to make the decision whether to drill and therefore impact the speculative value of the mineral estate if the well were unsuccessful.

Our conclusion is consistent with the Fifth Circuit's decision in *St. Louis Royalty Co. v. Continental Oil Co.*,[41] in which the facts were similar to those before us today. In *St. Louis Royalty Co.*, the lessors brought suit long after the lessees had conducted successful exploration, drilling, and production operations, contending that the lease had expired many years earlier because there was no actual production during the primary term. The lease had a 60–day drilling clause, and a well had been successfully drilled during the 60–day period after the primary term expired. The Fifth Circuit held that the well maintained the lease under the 60–day clause. But that court also held, as an alternative ground, that the lessees "by open, notorious, and adverse possession for more than five years with payment of taxes, under a claim of right brought home to plaintiff, acquired a good and perfect title, to the leasehold interest."[42] The opinion in *St. Louis Royalty Co.* further observed that "the things [lessees] were doing were not done secretly and in a corner, but openly and in the face of all the world, with full knowledge thereof brought home to plaintiff and its predecessors in title."[43] Our Court later described *St. Louis Royalty Co.'s* alternative holding and the facts supporting it, saying,

> [T]he plaintiff and its predecessors in title, although fully informed of the lessee's claim to and operations under the lease, did not assert that the same had terminated until some ten years after the end of the primary term, during which time the lessee had developed the property by drilling seven producing wells.... The [Fifth Circuit] then went on to say that if the leases had lapsed, the plaintiff was still not entitled to recover because the evidence established

**40.** *See generally Thomas v. Rex A. Wilcox Trust*, 185 Mich.App. 733, 463 N.W.2d 190, 192–93 (1990) (holding adverse possession established against co-owner of mineral interest because the other owner "had openly, notoriously, exclusively, and successively possessed full working interests in the oil and gas leases under color of title" and had "received one hundred percent of the working interests proceeds generated by operation of the wells" even though the co-owner owned one-half of the mineral interest).

**41.** 193 F.2d 778 (5th Cir.1952).

**42.** *Id.* at 780.

**43.** *Id.* at 782.

as a matter of law that the defendants had perfected a limitation title to the leasehold estate.[44]

In the cases before us today, the fact that the lessees were claiming the right and title to all of the production and the right to drill and explore for oil and gas, subject only to the royalty obligation, was open and notorious and was hostile to the lessors' claim that all title and interest reverted to the lessors and that the lessees ceased to own any interest in the minerals. As one noted treatise has concluded, "a lessee who develops and produces under a lease which previously terminated may acquire title to such lease by adverse possession." [45]

The lessors also contend that the lessees' possession was never "adverse" because the lessees did not recognize that the leases had terminated when they continued operations and therefore lacked the requisite intent to adversely possess the mineral interests. Our decision in *Calfee v. Duke*[46] leads us to disagree with this contention. In that case, Calfee, an heir to J.H. Duke, occupied approximately 248 fenced acres of land. His deed from his parents did not include 24 of those acres. The other Duke heirs brought a trespass to try title suit, claiming that they and Calfee became co-tenants upon Calfee's parents' death with regard to the 24 undeeded acres. We observed that Calfee "never thought of himself as claiming adversely to anyone for the simple reason that he thought he was the rightful owner and had no competition for that ownership." [47] We held that this satisfied the statute's requirement of adverse possession:

> That being his claim of right, and it being coupled with his actual and visible possession and use, the adverse claim and possession satisfy the statutory requirements and cannot be defeated by Calfee's lack of knowledge of the deficiency of his record title or by the absence of a realization that there could be other claimants for the land.[48]

In the cases before us today, the lessors essentially contend that the lessees should have notified them that the leases had terminated and that the fee interest in the minerals had reverted to the lessors. This is tantamount to saying that the running of limitations is suspended until the record titleholder obtains actual knowledge of what it owns. This is a novel proposition indeed. It would mean, for example, that limitations would be suspended whenever heirs did not realize that they had inherited an interest. That has never been the law in Texas. A record titleholder's ignorance of what it owns does not affect the running of limitations. The lessees' possession of the mineral estates in the cases before us today was adverse, and all the requirements of the three-, five-, and ten-year statutes of limitations were met.

44. *Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co.*, 157 Tex. 489, 305 S.W.2d 169, 172 (1957).

45. 1 KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 10.5, at 280 (1987). We *also note that the court of appeals' decisions in the Pool cases regarding adverse possession were questioned by at least one commentator. See* 3 WILLIAMS & MEYERS, OIL AND GAS LAW § 604.9 n. 7 (2002) (noting that the requirement of "actual notice of adverse possession through some type of act of repudiation after the lease has automatically terminated for lack of production . . . appears to be inconsistent with the fee simple determinable/automatic termination feature of oil and gas leases").

46. 544 S.W.2d 640 (Tex.1976).

47. *Id.* at 642.

48. *Id.*

■ Statutes of limitations require someone with a claim to assert that claim within a specified period of time, and the statutes of limitations dealing with real property are no different. The Legislature has required those claiming an interest in real property to "bring suit" within certain periods of time.[49] Statutes of limitations are designed "to compel the assertion of claims within a reasonable period while the evidence is fresh in the minds of the parties and witnesses"[50] and to "prevent litigation of stale or fraudulent claims."[51] The lessors in the cases before us contend that title reverted to them a number of years ago, perhaps as long as 57 years before suit was filed under the *Pool 1* leases, and as long as 39 years before suit was filed under the *Pool 2* lease. The last occasion when title could have reverted under the *Pool 1* leases was 14 years before suit was filed, and for the *Pool 2* lease, it was 29 years. These are the types of claims that statutes of limitations were intended to foreclose.

Our decision should not be read as awarding fee simple absolute interests to the lessees in the oil and gas resources at issue. The lessees acquired the same interest that they adversely and peaceably possessed, that is, the oil and gas leasehold estates as defined by the original leases.[52] Those interests are fee simple determinable interests in the respective properties on the same terms and conditions as the original leases. The terms that made the original mineral estates "determinable" continue to apply to the fee simple determinable interests acquired by adverse possession.

The court of appeals accordingly erred in failing to hold that the lessees acquired leasehold interests by adverse possession.

## III

In *Pool 1*, the lessors have brought forward a cross point in which they contend that some of the instructions and definitions in the trial court's charge to the jury on the limitations issues were incorrect. Among these complaints is the contention that the definition of "Notice of repudiation" accompanying the question regarding the ten-year statute of limitations allowed the jury to find adverse possession based on "long-continued" possession coupled with a repudiation that occurred less than ten years before suit was filed. The trial court's instruction said in pertinent part:

> You are instructed that, with respect to this question only, "adverse possession" means that the Plaintiffs or their predecessors as titleholders, had notice that the Defendants' gas lease has been repudiated, and Defendants were in peaceable and adverse possession of the lease and drilled for or operated and produced gas from wells thereon and used or enjoyed the property under a title instrument for a period of ten (10) years after August of 1964. For pur-

49. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE §§ 16.024, 16.025, 16.026.

50. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996) (citing *Price v. Estate of Anderson,* 522 S.W.2d 690, 692 (Tex.1975) and *Gaddis v. Smith,* 417 S.W.2d 577, 578 (Tex.1967)).

51. *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977).

52. *See generally St. Louis Royalty Co. v. Continental Oil Co.,* 193 F.2d 778, 780 (5th Cir. 1952); 1 KUNTZ, supra note 45 § 10.5, at 280 (concluding that "a lessee who develops and produces under a lease which previously terminated may acquire title to such lease by adverse possession"); 1 WILLIAMS & MEYERS, supra note 45 § 224.1, at 355 ("[A]n adverse possessor acquires no greater interest than that claimed. . . .").

poses of this instruction, a gas lease is to be considered as a title instrument.

"Notice of repudiation" may be inferred to have been brought home to a titleholder where there has been long-continued possession by the adverse possessor under a claim of ownership coupled with the non-assertion of claim by the titleholder; by "non-assertion of claim by titleholder" means the absence of an overt act of ownership on part of the record owner which is inconsistent with the possession of the adverse possessor.

The language explaining "notice of repudiation" substantially tracks the holding of this Court in *Tex–Wis Co. v. Johnson*,[53] which concerned the fee simple title to a tract of land. This Court said, "[W]e hold that the jury may infer that notice of repudiation has been brought home to the titleholder where there has been (1) long-continued possession under claim of ownership and (2) nonassertion of claim by the titleholder."[54] In that case, Alexander lost title to 96 acres of a 150–acre tract in foreclosure proceedings. He, and after him his family, nevertheless continued to occupy the entire 150–acre tract for 34 years, from 1921 to 1955, without any intervening claim by the record titleholder.[55] This Court held that this extended period of time was evidence from which the jury could infer notice of repudiation to the record titleholder.[56] The Court explained that its holding was an application of rules regarding circumstantial evidence:

[Our holding] is nothing more than an application of the rule of circumstantial evidence that the existence of certain facts tends to support a reasonable inference that the record owner has been put on notice that the tenancy has been repudiated. To this extent, both satisfy the rationale for requiring such notice. Where a tenancy relationship has arisen, the landlord is normally justified in assuming that the tenant's use of the premises is permissive and in recognition of the landlord's title. However, under certain circumstances, this assumption ceases to be justifiable. Thus acts which are inconsistent with the original use of the property may be sufficient to put the owner on notice that the tenancy has been repudiated. The same has been held to be true in cases of long-continued possession by the tenant under claim of ownership where the landlord has failed to assert any claim. Under such circumstances, the jury may find that continued reliance on the tenancy by the landlord was unreasonable and unwarranted.[57]

We further explained that the extended period of possession must have occurred and thus have constituted notice of repudiation before the applicable statute of limitations began to run.[58] We reiterated what had been said in *Sweeten v. Park*,[59] which was that possession for three and one-half years before the limitations period began was insufficient.[60] But we said in *Tex–Wis* that "24 years in excess of the 10–year statutory period falls within the *Mauritz*[61] rule, as constituting 'long-con-

---

**53.** 534 S.W.2d 895, 901 (Tex.1976).

**54.** *Id.*

**55.** *Id.* at 898 n. 2.

**56.** *Id.* at 902.

**57.** *Id.* at 901.

**58.** *Id.* at 901–02.

**59.** 154 Tex. 266, 276 S.W.2d 794 (1955).

**60.** *Tex–Wis Co.*, 534 S.W.2d at 902.

**61.** *Mauritz v. Thatcher*, 140 S.W.2d 303 (Tex. Civ.App.-Galveston 1940, writ ref'd).

tinued' possession."[62]

In *Pool 1*, the first period when there was no actual production under the leases occurred in 1941, 57 years before suit was filed and 47 years before the ten-year statute allegedly began to run. The last period of nonproduction occurred in 1984, fourteen years before suit was filed and four years before the ten-year statute allegedly began to run. It is thus unclear why the date of August 1964 was used in the instruction regarding the ten-year statute of limitations. But we need not parse through whether another date should have been used, or whether a four-year period of possession before a ten-year period of possession occurred would be adequate to comport with the "long-continued possession" principles set forth in *Tex–Wis* and the cases cited therein. For the reasons discussed above in section II, as a matter of law, the lessors were put on notice that the lessees' claims were hostile to the claim that the lease had terminated when the lessees continued to operate the leases, produce oil or gas, sell it, and pay only a royalty to the lessors. Adverse possession under the ten-year statute was conclusively established. Any error in the charge to the jury was harmless. And, because adverse possession under the ten-year statute of limitations was established as a matter of law, we need not consider whether there was any error in the charge to the jury regarding the three- and five-year statutes of limitations.

## IV

As noted throughout this opinion, we have not reached the question of whether the leases terminated due to cessation of production. Specifically, it is unnecessary to decide whether the terms "is produced" or "so long as natural gas is produced" as used in the leases before us mean that the leases would terminate whenever actual production ceased, or instead, whether the leases would terminate only when production in paying quantities ceased. Nor do we decide whether the doctrine of temporary cessation of production includes or should include cessation of production for economic reasons.

The dissent contends that in deciding these cases based on statutes of limitations, we have "put[ ] the cart before the horse."[63] The dissent proposes that these cases be remanded for a trial of fact issues that it concludes are raised under its view of the temporary cessation of production doctrine.

For reasons of judicial economy, this Court has long required that dispositive issues must be considered and resolved and that a judgment moving the case to the greatest degree of finality must be rendered. We held in *Bradleys' Electric, Inc. v. Cigna Lloyds Insurance Co.* that when a party presents multiple grounds for reversal of a judgment on appeal, appellate courts should first address issues that would require rendition.[64] In accord with that principle, in *CMH Homes, Inc. v. Daenen*, we addressed whether the evidence was legally sufficient to support the judgment, and concluding that it was not, rendered judgment without considering whether venue was proper.[65] Any error in venue would have only required a remand.[66] We similarly have admonished courts of appeals that "[p]rior to ordering a remand, points calling for rendition of

---

62. *Tex–Wis Co.,* 534 S.W.2d at 902.

63. 124 S.W.3d at 202 (JEFFERSON, J., dissenting).

64. 995 S.W.2d 675, 677 (Tex.1999).

65. 15 S.W.3d 97, 99 (Tex.2000).

66. *Id.*

judgment should be considered."[67] The disposition of the statutes of limitations questions resolves the cases before us, and therefore, we do not reach other issues presented.

\*　　\*　　\*　　\*　　\*　　\*

For the foregoing reasons, we hold that the court of appeals erred in failing to hold that the lessees in these two cases acquired fee simple determinable mineral estates by adverse possession. Accordingly, we reverse the judgments of the courts of appeals and render judgments for the lessees.

Justice JEFFERSON filed a dissenting opinion.

Justice O'NEILL and Justice BRISTER did not participate in the decision.

Justice JEFFERSON, dissenting.

Because the Court evades a pressing issue in this case, I write separately. The Court characterizes the issue as whether the lessees acquired a fee simple determinable interest in the mineral estate by adverse possession and concludes that the court of appeals "erred in failing to hold that the lessees acquired leasehold interests by adverse possession." This characterization bypasses the real issue—whether the leases terminated due to cessation of production. The parties have clearly presented and fully briefed this question, which is undoubtedly important to the jurisprudence of the State. Although the Court has devised an elegant solution in this particular case, the overarching legal question will surely recur in circumstances where adverse possession is not a viable defense.

The Court repeatedly disavows any intent to decide whether the leases in these cases terminated when production ceased. Instead, it concludes that the lessees acquired, by adverse possession, the same interest they held under the leases. Resolving the case in this way is premature. By deciding that the lessees acquired a leasehold interest by adverse possession without first resolving whether the leases actually terminated, the Court puts the cart before the horse. I suspect that future lessors will cite this case as implicit authority that a lease—whose profitable production is not in question-terminates on the sole ground that the lessee suspended operations temporarily to advance the lease's profitability for all concerned.

The Court's resolution of the case introduces a new twist on adverse possession that, at least on its face, divests a prior owner of property without the sort of notorious ouster we have previously mandated. Traditionally, adverse possession requires hostility. *Killough v. Hinds*, 161 Tex. 178, 338 S.W.2d 707, 711 (1960). In the cases the Court decides today, however, the lessees had permission to market and produce oil and gas on the lessors' property. As a predicate to adverse possession, we have required the ostensible new owner to have given notice of its repudiation of the prior owner's title. *Id; Sweeten v. Park*, 154 Tex. 266, 276 S.W.2d 794, 797 (1955). That the lessees resumed production after periods of temporary nonproduction, drilled a replacement well, erected signs on the property, and paid ad valorem taxes is not inconsistent with the rights they enjoyed under the lease. Both the lessees and lessors proceeded as though the leases were still in effect. Thus, the lessees' possession was arguably permissive and not hostile.[1] The Court concludes that the

---

67. *Lone Star Gas Co. v. R.R. Comm'n of Tex.*, 767 S.W.2d 709, 710 (Tex.1989).

1. This view is consistent with that of other states. *See Smith v. Graf*, 259 Ky. 456, 82

lessors here were on constructive notice of termination of their leases for the following reasons: (1) the former lessee remained on the property for a statutory period of time; (2) the former lessor did not receive the full portion of royalties it would be due if the lease were terminated; and (3) the former lessee continued to deplete the mineral resources of the property. But each of the factors would be status quo for the lessor/lessee relationship. Nothing in the Court's reasoning indicates how the lessor should know that these activities differ from those undertaken while the lease was in effect. Without actual notice of cessation, and thus no notice of termination, the lessor would not be aware that the adverse possession period had begun. Such a rule would be difficult for any lessor, and particularly impossible where a royalty interest is split among multiple parties. I raise these concerns not to answer them here but to emphasize that we need not disturb our law on adverse possession to resolve the question squarely presented-whether the leases terminated upon a temporary cessation of production.

The record in these consolidated cases suggests that production ceased for short periods of time so that the lessees (and lessors) could benefit from higher winter prices. We should remand this cause to permit the trier of fact to determine whether a temporary cessation that furthers the economic interest of both lessors and lessees was reasonable under the circumstances.

## I

The typical habendum clause in Texas mineral leases grants a lessee mineral rights to the leased land for a fixed primary term and, if the lessee begins production by the end of the primary term, for a secondary term that lasts "as long thereafter as oil and gas is produced." The durational language in the habendum clause conveys a fee simple determinable estate in the secondary term, leaving the lessor with a possibility of reverter. *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 28–29 (1929); *Stephens County v. Mid–Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S.W. 290, 295 (1923). When, as here, there is no savings clause, we have held that periods of nonproduction during the secondary term automatically terminate the lease. *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941).

The primary object of an oil and gas lease is to "secure development of the property for the mutual benefit of the parties." *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 512 (1942). But under the automatic termination rule, without a savings clause, cessation of production in the secondary term automatically terminates the lease, even if profitable production is later restored. *Amoco Prod. Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex.1978); *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941). To mitigate the harshness of this automatic termination rule, courts "necessarily impl[y]" a "temporary cessation of production" (TCOP) doctrine. *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 946 (1959); *Watson*, 155 S.W.2d at 784. The TCOP doctrine presumes that the parties understood that mechanical problems, reworking operations, or other similar events would inevitably interrupt production from time to

S.W.2d 461 (1935); *Lehmann v. Keller*, 454 Pa.Super. 42, 684 A.2d 618 (1996)(possession under an oil and gas lease does not give rise to an adverse possession claim because the lessors consented to the lessee's possession);

*see also* 1 Kuntz, A Treatise on the Law of Oil and Gas § 10.5 ("The working of minerals by a lessee who also claims under a lease from the mineral owner is not adverse possession.").

time. 1 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 4.4(b) (1994). It also presupposes that the parties did not intend for such occurrences, which are incidental to normal oil and gas operations, to terminate the lease. *Winsauer*, 323 S.W.2d at 946; *Sunray DX Oil Co. v. Texaco, Inc.*, 417 S.W.2d 424, 428 (Tex.Civ.App.-El Paso 1967, writ ref'd n.r.e.); 3 WILLIAMS & MEYERS, OIL & GAS LAW § 604.4 (2001). The doctrine gives lessees a reasonable period of time in which to remedy the defect and resume production. *Winsauer*, 323 S.W.2d at 946.

This Court recognized the TCOP doctrine in *Watson v. Rochmill:*

> The strictness of the [automatic termination] rule has been modified where there is only a temporary cessation of production due to sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like. Under such circumstances there are authorities which hold that the lessee is entitled to a reasonable time in which to remedy the defect and resume production.

155 S.W.2d at 784. Under this doctrine, the lessor must prove an actual cessation of production. The burden then shifts to the lessee to prove that the cessation was excused by the TCOP doctrine. *Cobb v. Natural Gas Pipeline Co. of Am.*, 897 F.2d 1307, 1310–11 (5th Cir.1990); *Bradley v. Avery*, 746 S.W.2d 341, 343 (Tex.App.-Austin 1988, no writ); 1 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 4.4(b) (1994).

We have applied a two-pronged test for determining whether a cessation of production falls under the TCOP doctrine and thus is legally excused from the automatic termination rule. *Watson*, 155 S.W.2d at 784; *Cobb*, 897 F.2d at 1309. The first prong focuses solely on the cause of the cessation. *Watson*, 155 S.W.2d at 784. Historically, under this prong, the lessee is required to prove that the cessation was due to a "sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like." *Watson*, 155 S.W.2d at 784. The second prong focuses on whether, under the circumstances, the lessee exercised diligence to remedy the defect and resumed production within a reasonable period of time. *Id; Cobb*, 897 F.2d at 1309.

The court of appeals in this case applied the traditional interpretation of this doctrine. It first explained that because the lessors had established that there was a cessation of production and that the leases contained no applicable savings clauses, the lessees were required to prove that the cessation fell within the TCOP doctrine. *Pool 1*, 30 S.W.3d at 647; *Pool 2*, 30 S.W.3d at 626. The court then conducted its TCOP inquiry and stated that, "for a cessation to be temporary, not only must it be due to some mechanical breakdown or something similar, but production must resume within a reasonable time." *Pool 1*, 30 S.W.3d at 648; *Pool 2*, 30 S.W.3d at 626. The court of appeals did not decide whether the lessees established that the reason for the stoppage was a mechanical breakdown or something similar, but instead "assumed" that to be the case. *Pool 1*, 30 S.W.3d at 648; *Pool 2*, 30 S.W.3d at 626. It then held, however, that the lessees failed to meet their burden to show that production was restored within a reasonable time. *Pool 1*, 30 S.W.3d at 648; *Pool 2*, 30 S.W.3d at 626. On that basis, the court of appeals affirmed the trial courts' judgments regarding cessation of production. *Pool 1*, 30 S.W.3d at 648; *Pool 2*, 30 S.W.3d at 628.

The court of appeals, employing the traditional TCOP rule, did not consider factors other than a "mechanical breakdown or something similar" that could have caused the cessation; consequently, it did

not review the extent to which economic factors may have excused a temporary cessation of production, or the relationship between those factors and the lessees' diligence in restoring production. Thus, the court of appeals' opinion, while it reflected a correct application of the current Texas TCOP doctrine, nonetheless disregarded evidence that the leases remained commercially profitable despite brief periods of nonproduction. As such, this case highlights the necessity for modification of the Texas TCOP doctrine to better reflect the fundamental purpose behind oil and gas leases.

## II

It is true, of course, that any proposed modification of the TCOP doctrine will draw into sharp relief the divergence in economic interests that underscore oil and gas leases. Lessors generally urge strict construction of the doctrine because it affords either immediate financial benefits in the form of royalty payments or permits renegotiation of their lease on terms superior to the bargain initially struck. If, for example, an existing lease terminated due to cessation of production, the lessor would be free to renegotiate the lease and obtain significant monetary benefits including higher bonuses and increased delay-rental payments. *See* Nancy J. Forbis, *The Shut–In Royalty Clause: Balancing the Interests of Lessors and Lessees*, 67 TEX. L.REV. 1129, 1135 (1989). Allowing a lease to continue despite a cessation of production, on the other hand, deprives lessors of the immediate and expected benefits of production and subjects the lease to potential drainage of oil and gas from beneath the land by producing wells on neighboring tracts. *Id.*

While lessors prefer a strict construction of the TCOP doctrine, lessees favor minimizing the circumstances under which their rights to production and marketing terminate. When a lease is terminated for non-production, the lessee forfeits not only its capital investment in the well, but also any profits that would have been realized over the course of the lease. In contrast to lessors, lessees are more willing to tolerate non-production in the short term to increase the well's profitability over time. Lessees have argued in many jurisdictions that the temporary loss of a market for their product, or cyclical periods during which production is economically disadvantageous, justifies a TCOP that does not threaten the continued vitality of the lease. When determining the scope of the TCOP doctrine, we must consider these conflicting interests.

The TCOP doctrine recognizes that lessors and lessees have a mutual interest in maintaining a lease that produces in paying quantities. Under current Texas law, however, if there is nonproduction for a valid economic reason, the lease will nevertheless terminate and revert back to the lessor. *See, e.g., Bachler v. Rosenthal,* 798 S.W.2d 646, 650 (Tex.App.-Austin 1990, writ denied). This is so even though we judicially imply a right to continue the lease after a mechanical breakdown because the parties intended that the well be profitable. Such a narrow application of the TCOP doctrine is contrary to the primary function of oil and gas leases and the TCOP doctrine's purpose. Our decisions limiting application of the doctrine have been described as narrow, disproportionately favorable to the lessor, arbitrary, inequitable, and harsh. *See, e.g., Somont Oil Co. v. A & G Drilling, Inc.,* 310 Mont. 221, 49 P.3d 598 (2002) (Treiweiler, J. dissenting); *Cotner v. Warren,* 330 P.2d 217, 219 (Okla.1958).

This case provides an opportunity to adopt a more balanced approach, one that promotes the parties' shared economic in-

terest while maintaining strong incentives for the lessees to avoid speculative interruptions in the production and marketing of oil and gas. Under the traditional TCOP doctrine, lessees would be required to produce even if it would be more beneficial to both parties to cease production for a short period while prices were depressed. Such a construction disregards the primary goal of oil and gas leases, whereas a more liberal construction effectuates the purpose of the lease. Construing the TCOP doctrine to apply to market-based interruptions in production—and not simply when there is a mechanical breakdown—comports with both parties' financial interests and avoids an unnecessarily harsh result. The TCOP doctrine developed because courts recognized that breakdowns in equipment and reworking operations are bound to occur and cause a temporary cessation of production. *Sunray DX Oil Co.*, 417 S.W.2d at 428. Courts also recognized that it would be patently unfair to terminate a lease when these events resulted in no actual production. Just as it is illogical to terminate a lease because of a mechanical breakdown, it is illogical to force a lessee to produce when the market penalizes production. Market fluctuations are as much a reality in oil and gas leases as broken equipment.

Here, there was some evidence that the lessees shut in their wells during the summer months when demand was slow in order to produce the maximum possible amount of gas in the winter, when prices were high. In these circumstances, deferred marketing of oil or gas could actually benefit the lessors as long as there is no drainage to other wells, no oil or gas is lost by ceasing production, and production is delayed only until the earliest possible point at which conditions for production are favorable. This approach permits both parties to realize greater profits and accomplishes the lease's primary function—

development of minerals for the parties' mutual benefit. *Garcia*, 164 S.W.2d at 512–13. Thus, I would hold that the TCOP doctrine should be equally applicable to market-induced interruptions as it is to stoppages caused by mechanical or other physical events.

In *Watson v. Rochmill*, this Court applied the TCOP doctrine to a two year and seven-month cessation. 155 S.W.2d at 784. Despite the fact that it was physically possible to extract oil, economic realities caused by the Depression were disincentives to production. *Id.* After stating the general TCOP rule, this Court concluded that the lease terminated because (1) the cessation of production, which lasted for two years and seven months, was not "temporary," and (2) "[t]he cessation of production for this long period of time was not brought about nor induced by any mechanical breakdown or other condition in connection with the well or the equipment used in connection therewith." *Id.* We noted that the "demoralized condition of the oil market . . . in no wise prevented the operation of the well by the lessee for whatever oil it would produce." 155 S.W.2d at 784. We also noted, however, that "[t]hese conditions may have rendered it unprofitable to operate the well" and could have been contracted against. *Id.* Thus, even though market conditions may have penalized production, we nonetheless required production to maintain the lease because the parties did not explicitly state in the lease that profits are preferable to losses. This was true even though we "necessarily implied" the TCOP doctrine into oil and gas leases to begin with. But the same rationale for implying the TCOP doctrine into oil and gas leases generally should apply here as well. Because the TCOP doctrine has proved workable in saving otherwise profitable leases from unwise termination, I would overrule *Watson*

to the extent it precludes application of the TCOP doctrine to situations in which production is deferred temporarily due to lack of a market or to enhance the lease's profitability for both the lessor and the lessee.

Other courts have adopted this reasoning and held that a temporary cessation of production caused by a lack of market does not terminate a lease. *Stimson v. Tarrant*, 132 F.2d 363 (9th Cir.1942); *Hoff v. Girdler Corp.*, 104 Colo. 56, 88 P.2d 100 (1939). In *Stimson*, the lessee produced oil into the fifth year of the secondary term, when pumping ceased for lack of a market. 132 F.2d at 363. After the market became nonexistent, the lessee produced 900 barrels of oil. Thereafter, however, the wells were shut down for fourteen months when existing storage space was filled, and no other storage facilities were available. *Id.* The Ninth Circuit held that lack of production for fourteen months did not terminate the lease. *Id.* In reaching this determination, the court observed that there was no loss from drainage, there was no intention to abandon the lease, and the temporary cessation was "in the mutual interest of the parties." *Id.*

A similar result was reached by the Colorado Supreme Court in *Hoff v. Girdler Corp.* In that case, the lessee produced helium gas during the primary term, but ceased production when the government, its primary customer, cancelled its contract. *Hoff*, 88 P.2d at 101. The court noted that after the government cancelled the contract and production ceased, there was no commercial market for helium gas and that the lack of such a market was the cause of the cessation of production. *Id.* at 102. In analyzing whether the cessation of production was temporary, the court considered: (1) the lessee's efforts to create a market for helium gas, (2) the fact that the lessee maintained its pipelines,

and (3) absence of drainage by other wells in the vicinity. *Id.* The court held that when a producing well is developed during its primary term but the product is not marketed due to lack of a commercial outlet, that alone is not enough to conclude that the lessee abandoned the lease. Instead, the failure to market must continue for an unreasonably long period of time. *Id.*

At least one commentator suggests that "the concept of temporary cessation should be equally applicable to market-induced interruptions as it is to stoppages caused by ... mechanical ... events." Thomas P. Battle, *Lease Maintenance in the Face of Curtailed/Depressed Markets*, 32 ROCKY MTN. MIN. L. INSTITUTE § 14.06[2] (1986). Battle's argument is based on the observation that "market fluctuations are as much a reality in the life of a lease as are physical upsets." *Id.* While Texas case law has remained stubbornly hostile to that approach, Battle cites examples in which Texas courts have relaxed the doctrine in other contexts. He then suggests that "it is reasonable to believe that a Texas court might take a more liberal approach when a lessee is faced with market fluctuations." *Id.* Like Battle, I believe that because our courts have already laid the groundwork for modifying the cessation doctrine, we should examine whether to add economic necessity to other existing chinks in the "automatic termination" armor.

In the past, this Court has implicitly applied the TCOP doctrine in a more liberal manner. *Midwest Oil Corp.*, 323 S.W.2d at 945. In that case, gas production ceased for 174 days due to a combination of litigation between the lessor and lessee and mechanical breakdowns. 323 S.W.2d at 945. Despite the fact that causes other than mechanical difficulties or sudden stoppages contributed to the

cessation of production, this Court concluded that the royalty interest had not terminated. *Id.* at 948. Had we narrowly construed the TCOP doctrine, the term royalty interest would certainly have terminated. Although the gas obstruction would have qualified as a permissible mechanical difficulty, litigation would not have been an acceptable excuse for cessation under a strict approach to the TCOP doctrine, especially when litigation was the initial cause of the cessation. *See also Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 315 (Tex.App.-Amarillo 2001, pet. denied)(applying TCOP doctrine to preserve lease in which production ceased temporarily due to litigation with buyer). Another example of the liberalization of the TCOP doctrine in Texas is *H.R. Casey v. Western Oil and Gas, Inc.*, 611 S.W.2d 676 (Tex.Civ.App.-Eastland 1980, writ ref'd n.r.e.). In *Casey*, the lessee ceased production for two months, explaining the cessation on three grounds: (1) it was negotiating a new sales agreement with the gas company, (2) the gas company had disconnected its gas well and a gas compressor unit was required for reconnection, and (3) three electric pump motors had been stolen. *Id.* at 679. Quoting *Watson*, but apparently unconfined by its language, the court of appeals concluded that the evidence regarding the causes of cessation, none of which could be classified as a mechanical breakdown or sudden stoppage, "support[ed] the trial court's conclusion that [the lessee held] a valid oil and gas lease on [lessor's] land." *Id.* On that basis, the court of appeals held that the cessation of production was "temporary" and "did not result in automatic termination of the lease as a matter of law." *Id.* at 680.

Courts are more likely to render judgments that are consistent with the rationale for implying the TCOP doctrine in the first place-preservation of productive leases for the mutual benefit of both parties—if they are permitted to consider, among other things, whether production is wise under the prevailing economic circumstances. Such consideration is inherent in the doctrine's underpinnings. *Garcia*, 164 S.W.2d at 512–13. When evaluating whether a cessation is temporary, courts should first consider the cause of the cessation, which may include evidence of mechanical breakdown, litigation, or economic feasibility. The court should then consider other factors to determine the lessee's diligence in resuming production, such as the length of the cessation and the lessee's good faith. I note, however, that as there can be no set time period for determine whether there is production in paying quantities, there is no set time frame for judging when a cessation is "temporary." *See Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 690 (1959) ("There can be no arbitrary period for determining the question of whether or not a lease terminated for the additional reason that there are various causes for . . . a temporary cessation of production. . . .").

To protect lessors, we should place restrictions on what constitutes a valid excuse for temporary non-production. These protections already exist as implied covenants in existing leases and include the implied covenants to: (1) develop the premises, (2) protect the leasehold, and (3) manage and administer the lease. *See Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981). The implied covenants to market and prevent drainage, the requirement of production in paying quantities, and the policy against holding leases for speculation are included as part of these covenants. Forbis, 67 Tex. L.Rev. at 1146. Thus, a court should ensure that the lessee acts as a reasonably prudent

operator in marketing the oil and gas,[2] protecting against drainage,[3] producing in paying quantities,[4] and not retaining the lease merely for speculation purposes.[5] Similarly, lessees "should not be able to claim a TCOP where they could have avoided any cessation by taking remedial actions at an earlier date." Bruce M. Kramer, *The Temporary Cessation Doctrine: A Practical Response to an Ideological Dilemma*, 43 BAYLOR L.REV. 519, 550 (1991). These requirements will help ensure that the lessee does not take unfair advantage of the lessor when production ceases. This approach not only furthers the purpose of oil and gas leases, it is also more consistent with the parties' intent than the rigid application of the TCOP doctrine that Texas courts currently apply.

## III

Due to the inequitable results that often ensue from application of a strict approach to the Texas TCOP doctrine, I would reject the *Watson v. Rochmill* formulation to the extent it forces the automatic termination of leases, in which profitable production is not in dispute, when there is a temporary cessation of production that furthers the economic interests of both lessors and lessees. Cessations of production should no longer be accorded temporary status only when they are caused by sudden stoppage or mechanical breakdown, but should permit the factfinder to weigh whether temporary nonproduction furthered the core function of the lease. This approach would ensure that Texas courts advance the policy behind implication of the TCOP doctrine in the first place—preservation of productive leases for the mutual benefit of both parties—

while respecting that Texas oil and gas leases are determinable fees.

Today's opinion threatens to disturb the delicate lessor/lessee relationship in oil and gas leases. By evading the TCOP issue, the Court opens the trial courts to novel litigation. Lessees will bring claims relating to old cessation issues and argue that they now adversely possess the entire mineral rights they once held only as lessee. While the Court purports to grant by adverse possession the same interest that was leased, it is unclear why a lessee who now owns the mineral rights, through adverse possession, would still be required to make royalty payments to a person who no longer owns the minerals that underscores the commercial lease relationship. The result is that rather than shut the door on new claims by avoiding the termination issue, the Court invites litigation over once-settled adverse possession jurisprudence. In the end, the Court's stated goal of judicial economy is not met.

The Court suggests that it has no option to defer a decision on adverse possession because the lessees seek rendition on that issue. It cites *Bradleys' Electric, Inc. v. Cigna Lloyds Insurance Co.*, 995 S.W.2d 675, 677 (Tex.1999), but that case requires only the courts of appeals to resolve dispositive issues, not the Supreme Court. While I agree that this Court should strive to render judgment when feasible, I do not agree that rendition is mandated when resolving the rendition point potentially causes more harm than good, and an opinion resulting in remand would settle an area of law that is in disrepair.

2. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 559 (Tex.2003).

3. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex.1981).

4. *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 269 (1960).

5. *Garcia v. King*, 164 S.W.2d at 513 (Tex. 1942).

Accordingly, I would reverse both courts of appeals' judgments and remand the cases to their respective trial courts for further proceedings consistent with this approach. For these reasons, I respectfully dissent.