NO. 07-08-0091-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

MAY 5, 2008
______________________________

MANUEL GUTIERREZ TORRES,
Â 
Appellant

v.

THE STATE OF TEXAS, 
Â 
Appellee

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â _________________________________

FROM THE 121st DISTRICT COURT OF TERRY COUNTY;

NO. 5729; HON. KELLY G. MOORE, PRESIDING
_______________________________

ON ABATEMENT AND REMAND
_______________________________

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
Â Â Â Â Â Â Â Â Â Â Appellant appeals from his conviction for aggravated assault. The clerkâs record
was due on April 21, 2008. No extension motion or record was filed. On April 28, 2008,
this court directed the clerk by letter âto advise the Court of the status of the clerkâs record
no later than May 08, 2008." In response, the clerk corresponded by letter that on âMarch
19, 2008, a bill of costs was forwarded to David Martinez, attorney for defendant. As of
April 30, 2008, the costs have not been receivedâ by the district clerk.
Â Â Â Â Â Â Â Â Â Â Accordingly, we abate this appeal and remand the cause to the 121st District Court
of Terry County (trial court) for further proceedings. Upon remand, the trial court shall
immediately cause notice of a hearing to be given and, thereafter, conduct a hearing to
determine the following:
Â Â Â Â Â Â Â Â Â Â 1. whether appellant desires to prosecute the appeal; 
Â Â Â Â Â Â Â Â Â Â 2. whether appellant is indigent; 
Â Â Â Â Â Â Â Â Â Â 3. whether counsel has been appointed to prosecute this appeal;
4. if counsel has not been appointed, whether appellant is entitled to
appointed counsel; and
Â 
5. whether the appellant is entitled to the preparation of a free appellate
record. 

Â Â Â Â Â Â Â Â Â Â The trial court shall cause the hearing to be transcribed. So too shall it 1) execute
findings of fact and conclusions of law addressing the foregoing issues, 2) cause to be
developed a supplemental clerkâs record containing its findings of fact and conclusions of
law and all orders it may issue as a result of its hearing in this matter, and 3) cause to be
developed a reporterâs record transcribing the evidence and arguments presented at the
aforementioned hearing, if any. Additionally, the district court shall then file the
supplemental clerkâs and reporterâs records transcribing the hearing with the clerk of this
court on or before June 5, 2008. Should further time be needed by the trial court to
perform these tasks, then same must be requested before June 5, 2008.
Â Â Â Â Â Â Â Â Â Â It is so ordered.
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Per Curiam
Do not publish.



false"
 UnhideWhenUsed="false" Name="Light Grid"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 









NO. 07-10-0397-CV

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL A 

Â 

 AUGUST 24, 2011



Â 

Â 



Â 

Â 

CHESAPEAKE EXPLORATION, L.L.C., APPELLANT

Â 

V.

Â 

DALLAS AREA PARKINSONISM SOCIETY, INC., AND AMERICAN CANCER SOCIETY HIGH
PLAINS DIVISION, INC.,Â  APPELLEES 



Â 

Â 



Â 

Â FROM THE 153RD DISTRICT
COURT OF TARRANT COUNTY;

Â 

NO. 153-241012-09; HONORABLE KEN CURRY, JUDGE



Â 

Â 



Â 

Before CAMPBELL and HANCOCK and PIRTLE,
JJ. 

Â 

Â 

MEMORANDUM OPINION

Appellant, Chesapeake
Exploration, L.L.C. ("Chesapeake"), appeals from entry of summary
judgment in favor of Appellees, Dallas Area Parkinsonism Society, L.L.C. ("DAPS")
and American Cancer Society High Plains Division, Inc. ("ACS"), on Chesapeake's
claim to recover bonus money paid to DAPS and ACS (together the "Charities")
in return for two oil and gas leases.Â  In
support, Chesapeake asserts the trial court erred in granting summary judgment
in favor of DAPS and ACS because (1) Chesapeake's rescission and restitution
claims are not barred as a matter of law under the theory that Chesapeake
bargained for and received a lease that operates as a quitclaim deed; and disputed
issues of material fact exist whether: (2) the parties shared a mistaken belief
that DAPS and ACS held title to the mineral estate which materially affected
the oil and gas transaction; (3) there is some evidence of a unilateral
mistake; (4) some or all of the bonus monies in equity and good conscience
belong to Chesapeake; (5) the Charities made negligent misrepresentations to Chesapeake;
and (6) some evidence exists supporting Chesapeake's claim for breach of the
covenant of seisin.Â  Â We reverse and remand for further proceedings
consistent with this opinion.Â  Â Â 

Background

The testamentary bequest of Clere
Pearle Geneske provided for the distribution of her residuary estate one-half
each to DAPS and ACS.Â  In April 2006, at
the request of ACS's counsel, Bill Roberts,[1]
Frank Finn and Bank One Trust Company, N.A., co-independent executors of Ms.
Geneske's estate, conveyed to DAPS and ACS all of the estate's "right,
title and interest" to two tracts of land totaling approximately 83 acres
in Tarrant County, Texas, (the "Property"). The conveyance
instrument, entitled Conveyance and
Assignment Without Warranty, was then filed in the
Tarrant County property records.[2]Â  At the time, DAPS and ACS believed that they
were the owners of the Property and were unaware that other entities possessed
superior title. 

In May 2006, the Charities leased the
Property to Llano Royalty, Ltd. (Llano) for purposes of oil and gas
exploration, development and production.Â 
During negotiations with Llano and in subsequent negotiations with Chesapeake,
Roberts referred to the Property as "our tract," "our
acreage," "[ACS]'s and [DAPS]'s minerals," "our
minerals," and "our land."Â 
When the Llano lease expired by its terms, Chesapeake sought to lease
the Property from the Charities.Â  Chesapeake
contracted with PFM, L.L.C. ("PFM"), an independent lease broker, to
negotiate and submit lease proposals to Chesapeake for approval.Â  Doug McCutchin, PFM's landman, was responsible
for negotiating and submitting lease proposals for the Property to Chesapeake.Â  It is undisputed that Roberts was the only
person who communicated with McCutchin on behalf of both DAPS and ACS.Â  Â Â 

In a series of e-mails prior to
execution of any lease between Chesapeake, DAPS and ACS, Roberts indicated that
he could "not warrant title, except that it is unencumbered."Â  While Chesapeake wanted a general warranty, Roberts
made a counterproposal of a special warranty and the parties agreed to a
provision wherein the Charities agreed to "bind themselves . . . and
assigns to warrant and forever defend all and singular the said property unto
said Lessee, herein, . . . against every person whomsoever claiming or to claim
the same or any part thereof, by, through and under [Lessor], but not
otherwise."Â  

Roberts then indicated by e-mail that
"[t]he only other thing we have not discussed is method of payment"
and suggested Chesapeake pay the bonus money by check.Â  He further suggested that, after Chesapeake
was "comfortable with the title," they could meet and Roberts would
exchange the original oil and gas lease for the bonus money.Â  McCutchin countered that Chesapeake would
rather pay using a 30 day draft because it would give them more time to run the
title back.Â  Roberts countered that the
Charities preferred a check and suggested:Â 
"How about if you (sic) we send you the lease, and you agree in
writing to pay us within 30 days after clearing title?"Â  McCutchin agreed to "pay within 30 days
of clearing title," and asked Roberts if he wanted "a letter
acknowledging this agreement?" On Chesapeake's behalf, PFM subsequently
performed a title search of the Tarrant County property records which revealed
the conveyance of the Property from Genseke's estate
to the Charities. 

In late 2007, Chesapeake executed two
oil and gas leases with DAPS and ACS pursuant to the terms negotiated between
Roberts and McCutchin (the Leases).Â  The
Leases' terms are virtually identical and state as folllows:Â  "In consideration of a cash bonus in
hand paid and covenants contained herein, Lessor hereby grants, leases and lets
exclusively to Lessee the following described land, hereinafter, called the
Leased premises . . . for the purpose of exploring for, developing, producing
and marketing oil and gas . . . ."

Paragraph 23 of the addendums to the
Leases stated as follows:

[Lessor] does hereby bind themselves, their heirs,
executors, administrators, successors, and assigns to warrant and forever
defend all and singular the said property unto the said Lessee, herein, their
heirs, successors, and assigns against every person whomsoever claiming the
same or any part thereof, by, through and under [Lessor], but not otherwise.

After
execution of the Leases and payment of $498,000 in bonuses ($249,000 each to
DAPS and ACS), Chesapeake recorded a memorandum of the Leases in the real property
records of Tarrant County and prepared to develop the Property.Â  As part of these preparations, Chesapeake subsequently
obtained a detailed drilling title opinion on the Property and discovered that
neither DAPS nor ACS owned any interest in the Property.Â  Instead, the chain of title revealed the Property
belonged to the Children's Medical Foundation of Dallas and the Dallas
Methodist Hospitals Foundation, Inc., through previous conveyances.Â  When Chesapeake sought to obtain a refund of
the Lease bonuses, the Charities refused to repay the money.Â  Thereafter, Chesapeake filed suit and
asserted actions for breach of the covenant of seisin, rescission of the Leases
due to mutual mistake, rescission of the Leases due to Chesapeake 's unilateral
mistake, money had and received/unjust enrichment and negligent
misrepresentation.

In April 2010, the Charities filed a
traditional motion for summary judgment asserting that all Chesapeake's
theories "fail because [Chesapeake] accepted leases from DAPS and ACS
containing special warranties."Â  The
Charities asserted the special warranty provision in the Leases did not
warranty title but warranted "that [the Charities] [had] taken no action
to encumber the title, or otherwise divest itself of any title it may have."Â  In July 2010, the Charities filed a
no-evidence motion for summary judgment on Chesapeake's action for negligent
misrepresentation asserting that Chesapeake did not rely on any representations
by DAPS or ACS regarding title to the Property but conducted an independent
investigation of the Property's title and bargained for the right to check
title before paying bonus money.Â  The
Charities also asserted they did not proximately cause any injury to Chesapeake
because the parties bargained for and received a conveyance that is the
functional equivalent of a quitclaim deed.

In two orders, the trial court
granted summary judgments in favor of the Charities on all Chesapeake's causes
of action and issued a final judgment wherein it ordered that Chesapeake take
nothing and taxed costs against Chesapeake.Â 
This appeal followed. 

Standard of Review

Because the propriety of a summary
judgment is a question of law, we review the trial court's granting of a
traditional or no-evidence summary judgment de
novo.Â  Valence Operating Co. v. Dorsett,
164 S.W.3d 656, 661 (Tex. 2005).Â  While
viewing the evidence in the light most favorable to non-movants, we resolve all
doubts and indulge every reasonable inference against movants. Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 215 (Tex. 2003).Â 


For a party to prevail on a traditional
motion for summary judgment, that party must conclusively establish the absence
of any genuine issue of material fact and that he or she is entitled to
judgment as a matter of law.Â  Tex. R. Civ. P. 166a(c); Browning
v. Prostok, 165 S.W.3d 336, 344 (Tex. 2005).Â  A defensive motion for summary judgment
should be granted if the defendant disproves at least one essential element of
each of the plaintiff=s causes of action, or conclusively establishes
all the elements of an affirmative defense as a matter of law.Â  Shaw v. Moss, 67
S.W.3d 836, 842 (Tex. 2001).Â  

For a party to prevail on a
no-evidence motion for summary judgment, the moving party must establish that
there is no evidence of one or more essential elements of the claim or claims
for which the non-movant would bear the burden of proof at trial.Â  Tex. R. Civ. P. 166a(i).Â  A no-evidence
summary judgment will be sustained when (1) there is a complete absence of
evidence of a vital fact, (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact,
(3) the evidence offered to prove a vital fact is no more than a scintilla, or
(4) the evidence conclusively establishes the opposite of a vital fact.Â  King Ranch Inc. v. Chapman, 118 S.W.3d
742, 750-51 (Tex. 2003), cert. denied, 541 U.S. 1030, 124 S.Ct. 2097,
158 L.Ed.2d 711 (2004).Â  When the
evidence supporting a finding rises to a level that would enable reasonable,
fair-minded persons to differ in their conclusions, more than a scintilla of
evidence exists.Â  Merrell
Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997).

Moreover, where, as here, the trial
court=s order granting summary judgment
does not specify the basis for the ruling, we must affirm summary judgment if
any of the summary judgment grounds are meritorious.Â  Western Investments, Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005).Â  See Texas Workers= Compensation Commission v. Patient
Advocates of Texas, 136 S.W.3d 643, 648 (Tex. 2004).

Quitclaim vs. Special Warranty

The traditional motion for summary
judgment filed by the Charities in the trial court asserted a single ground for
defeating all Chesapeake's theories for recovery of the Leases' bonuses, i.e.,
that the Leases, although containing a special warranty, did not warrant title but
instead operated as a quitclaim deed.Â  The
Charities asserted the special warranty provision "simply warrant[ed] that
if the grantor has title, he has done
nothing to encumber or otherwise divest himself of title." (Emphasis
added).Â  Chesapeake counters that the Leases'
provisions taken as whole represent a special warranty that purports to convey property,
not a quitclaim purporting to convey the right, title, and interest, if any, of
the Charities in any given property.

A deed that is unambiguous is
construed as a matter of law.Â  J. Hiram Moore, Ltd. v. Greer, 172
S.W.3d 609, 613 (Tex. 2005).Â  Texas law
has long recognized that an oil and gas lease is not a "lease" in the
traditional sense of a lease of the surface of real property.Â  Natural Gas Pipeline Co. of America v. Pool, 124 S.W.3d 188, 192
(Tex. 2003).Â  Rather, "[i]n a typical oil and gas lease, the lessor is a grantor
and grants a fee simple determinable interest to the lessee, who is actually a
grantee.Â  Id. (citing W. T. Waggoner
Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 28-29 (Tex. 1929)).[3]Â  As a result, the lessee/grantee acquires
ownership of all the minerals in place that the lessor/grantor owned and
purported to lease.Â  Id.

A warranty deed to land conveys property
while a quitclaim deed conveys the grantor's rights in that property, if
any.Â  Geodyne
Energy Income Production v. The Newton Corporation, 161 S.W.3d 482, 485
(Tex. 2005) (citing Cook v. Smith,
107 Tex. 119, 174 S.W. 1094, 1095 (Tex. 1915)).Â 
In deciding whether an instrument is a quitclaim deed, courts look to
whether the language of the instrument, taken as a whole, conveyed the property
itself or merely the grantor's rights.Â  Id.; Enerlex,
Inc. v. Amerada Hess, Inc., 302 S.W.3d 351, 354 (Tex.App.--Eastland 2009,
no pet.).Â  What is important and controlling
is not whether the grantor actually owned the title to the land conveyed, but
whether the deed purported to convey the property.Â  Enerlex, 302
S.W.3d at 355 (citing Am. Republics Corp.
v. Houston Oil Co. of Texas, 173 F.2d 728, 734 (5th Cir. 1949)); Cook, 174 S.W. at 1096.Â  Further, "[t]he language of the
conveyance will be construed most strongly against the grantor and in favor of
the grantee, so as to convey the greatest estate which the language used can be
construed to pass."Â  Roswurm v. Sinclair Prairie
Oil Co., 181 S.W.2d 736, 744 (Tex.Civ.App.--Fort
Worth 1943, writ ref'd w.o.m.).

The Leases herein stated that "[i]n consideration of the cash bonus in hand paid and covenants
contained herein, Lessor hereby grants, leases and lets exclusively to Lessee
the following described land . . . for the purposes of exploring for,
developing, producing and marketing oil and gas . . . ." Â This phrase is followed by a detailed
description of the Leased property and represents a present grant of a
determinable fee interest in land.Â  Obelgoner v. Obelgoner, 526 S.W.2d 790,
792 (Tex.Civ.App.--Corpus Christi 1975, writ ref'd n.r.e.) (the
phrase "hereby grants, leases and lets exclusively unto Lessee . . .
indicates a present
grant").Â  See Parker v. Standard Oil Co. of Kansas, 250 S.W.2d 671, 681
(Tex.Civ.App.--Galveston 1952, writ ref'd n.r.e.) ("A mineral lease is the
conveyance of a determinable fee interest in land" and "[t]he intention of the parties to a mineral lease is that
minerals shall be produced from the land lease, and shared as therein
specified.")Â  

Both in their briefs on appeal and in
their pleadings before the trial court, the parties describe the warranty
clause to the Leases as a special warranty, i.e., that DAPS and ACS
"warrant and forever defend all and singular the said property unto the
said Lessee, herein, . . . against every person whomsoever claiming the same or
any part thereof, by, through and under [Lessor], but not otherwise."Â  As such, taken as a whole, the language of
both the granting and warranty clauses supports a conclusion the Leases purport
to convey title to the Property itself, not merely quitclaim the Charities
rights therein.Â  See Whitehead v. State, 724 S.W.2d 111, 112 (Tex.App.--Beaumont
1987, writ ref'd) (deed containing the qualifying words "by, through or
under me, but not otherwise" not a quitclaim deed but a special warranty
deed); Van Cleave v. Bell Oil & Gas
Co., 102 S.W.2d 1103, 1105 (Tex.Civ.App.--Fort Worth 1937, writ dism'd) (warranty
clause that contains the qualifying words "by, through, or under me, but
not otherwise," is not a quitclaim deed); Huling v. Moore, 194 S.W. 188, 192 (Tex.Civ.App.--San Antonio 1917, writ
ref'd) (special warranty deed was not a quitclaim deed, but conveyed the land
itself).Â  As a result, Chesapeake's breach
of the covenant of seisin, money had and received, unjust enrichment, recession
and restitution claims are not barred as a matter of law under the theory that
Chesapeake bargained for and received a quitclaim.Â  

Chesapeake's first issue is
sustained.Â  Having sustained Chesapeake's
first issue, issues two, three, four and six are pretermitted.

Negligent
Misrepresentation

In their no-evidence
motion for summary judgment, the Charities assert that Chesapeake cannot
prevail because it cannot show justifiable reliance or causation[4]
because it conducted an independent investigation of the property's title and
bargained for the right to check the property's title before paying any bonus
money.Â  See King Ranch, Inc., 118 S.W.3d at 751 (no-evidence summary
judgment sustained when evidence conclusively establishes the opposite of a
vital fact).Â  The Charities also assert
they made no representations regarding title to the property.

Viewing the evidence in a light most
favorable to Chesapeake while resolving all doubts and indulging every
inference against the Charities, we find that the Charities have failed to
establish as a matter of law the opposite of a fact vital to Chesapeake's cause
of action, to-wit: justifiable reliance.Â 
If anything, the results of Chesapeake's preliminary independent title investigation
reinforced the information that was being provided by the Charities, i.e., that
they held title to the Property.Â  Where
an independent investigation "fails to disclose any facts which
contradicted those made by applicant, nor did they reveal anything that would
lead defendant to believe applicant's statements were untrue . . . the defendant
[does] not preclude itself from relying upon the truth of applicant's statements
and warranties."Â  Gaston v. Woodmen of World Life Ins. Soc.,
167 S.W.2d 263, 265 (Tex.Civ.App.--Fort Worth 1942, writ dism'd); Woodmen of the World Life Ins. Co. v.
Davenport, 159 S.W.2d 913, 918 (Tex.Civ.App.ÂEastland
1941, no writ).Â  "The mere
fact that one makes a personal investigation, or consults with others, or has
other sources of information open to him, does not necessarily show that he
relied on such personal investigation, or the information gained therefrom, or
through other sources."Â  Durham v. Wichita Mill & Elevator Co.,
202 S.W. 138, 142 (Tex.Civ.App.--Fort Worth 1918, writ ref'd).Â  See
Kessler v. Fannig, 953 S.W.2d 515, 519
(Tex.App.--Fort Worth 1997, no writ) ("possibility of an independent
investigation that might have uncovered fraud does not preclude recovery for
fraudulent representations" and "the [plaintiff's] inspection was not
a defense to this misrepresentation claim"); Carruth v. Allen, 368 S.W.2d 672, 679 (Tex.Civ.App.--Austin 1963,
no writ) ("An independent investigation of matters that eventually
culminate in a contract does not as a matter of law defeat a right to rely on
allegedly false representations.")Â  Compare Camden Machine & Tool, Inc. v. Cascade Company, 870 S.W.2d 304,
311 (Tex.App.--Fort Worth 1993, no writ) ("when a person makes his own
investigation of the facts, and knows the
representations are false, he cannot, as a matter of law, be said to have
relied upon the misrepresentations of another") (emphasis added).Â  "The material question is, Did [Chesapeake] . . . rely on false statements or
misrepresentations made by the [Charities]?"Â  Durham,
202 S.W. at 142.[5]

In addition, an injury may have more
than one producing cause, and Texas courts have found that a seller's
misrepresentations can be a producing cause of a buyer's injury even when the
buyer has conducted an independent investigation.Â  See,
e.g., Kessler, 953 S.W.2d at 519; O'Hern v. Hogard, 841 S.W.2d 135, 137-38 (Tex.App.--Houston [14th
Dist.] 1992, no writ) (finding inspection did not constitute new and
independent cause of buyer's damages and determining proper inquiry is whether
the seller's act was the producing cause of buyer's damages).Â  The rationale behind doing so is that,
although the buyer may have conducted an independent investigation, he may have
also relied on representations by the seller and seller's agent.Â  Kessler,
953 S.W.2d at 519.Â 
Thus, without evidence to show that a buyer relied exclusively on his independent
report or had actual and complete knowledge of the alleged defect, false
information provided by the seller might have been a producing cause of a
buyer's damages.Â  Blackstock v. Dudley, 12 S.W.3d
131, 133-34 (Tex.App.--Amarillo 1999, no pet.) Â The Charities' summary judgment evidence fails
to establish as a matter of law the opposite of a vital fact, to-wit: that Chesapeake
relied either exclusively on PFM's title search or that Chesapeake had actual
and complete knowledge of the defect in the Charities' title to the property.Â  

Regarding the Charities' representations,
the statements in the record that, during negotiations, the Charities referred
to the property as "[ACS]'s and [DAPS]'s minerals," "our
minerals," and "our land," at the least, when coupled with McCutchin's affidavit wherein he states he relied on the
CharitiesÂ representations as well as the Leases' granting clauses and special
warranty provisions in executing the Leases, creates a fact issue whether Chesapeake
reasonably relied upon those representations.Â 
In addition, our review of the e-mail exchange wherein the Charities assert
Chesapeake assumed the risk of checking title and ownership of the property,
when viewed in a light most favorable to Chesapeake, indicates otherwise.Â  That is, after the parties completed their
negotiations of the special warranty provision, the negotiations, at the Charities'
request, turned to the method of payment--not the parties' relative contractual
responsibilities regarding title to the property.Â  

Further, we do not reach the issue raised
by the Charities whether the special warranty provision, by itself, put Chesapeake
on notice as to any doubts regarding the Property's title.Â  This argument was not made to the trial court
in either motion for summary judgment.Â  To preserve error on appeal, a party must
make a timely, specific objection or motion to the trial court that states the
grounds for the ruling sought with sufficient specificity and complies with the
rules of evidence and procedure.Â  See Tex.
R. App. P. 33.1(a).Â  If an argument is
presented for the first time on appeal, it is waived.Â  Id.Â  See Marine Transport Corp. v. Methodist Hospital, 221 S.W.3d 138, 147 n.3 (Tex.App.--Houston
[1st Dist.] 2006, no pet.).Â  

That said, however even if we were to
consider the cases cited by the Charities in support of the principle that a
special warranty deed itself puts a party on notice of defects in the title as
a matter of law; see McIntyre v. DeLong, 8 S.W. 622, 623 (Tex. 1888); Rhode v. Alley, 27 Tex. 443, 1864 Tex.
LEXIS 21, at *3 (Tex. 1864); see also Colonial
& U.S. Mortgage Co., Ltd. v. Tubbs, 45 S.W. 623, 624 (Tex.Civ.App.--Dallas 1898, no writ), other cases indicate that, while a
quitclaim deed to land conveys upon its face doubts about a grantor's interest
and a buyer is necessarily put on notice as to those doubts; South Plains Switching, Ltd. v. BNSF Railway
Company, 255 S.W.3d 690, 707 (Tex.App.--Amarillo 2008, no pet.), a special
warranty deed does not, of itself, carry notice of defects in title.Â  Richardson
v. Levi, 67 Tex. 359, 3 S.W. 444, 447 (1887) ("On its face, [a special
warranty deed] possesses an indefeasible title, and gives no notice that there
may be some secret claim which may defeat it."); Munawar v. Cadle Co.,
2 S.W.3d 12, 16 (Tex.App.--Corpus Christi 1999, pet. denied); Paul, 211 S.W.2d at 356.Â  We believe the second group of cases present
the more reasoned approach because a special warranty deed conveys the land
itself; Paul, 211 S.W.2d at 356; Choice Acquisitions No. Two,
Inc. v. Noesi,
No. 14-06-00973-CV, 2007 Tex. App. LEXIS 6218,
at *15-20 (Tex.App.ÂHouston [14th Dist.]
2007, no pet.) (mem. op.); Huling, 194 S.W.
at 192, and is not a quitclaim deed.Â  Whitehead, 724 S.W.2d at
112; Van Cleave, 102 S.W.2d at 1104.Â  Accordingly, Appellant's fifth issue is
sustained.

Conclusion

Â Â Â Â Â Â Â Â Â Â Â  The
trial court's judgment is reversed and this cause is remanded for further
proceedings consistent with this opinion.Â Â Â 


Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Patrick
A. Pirtle

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â  Justice 











[1]Roberts
was the Associate Corporate Counsel in ACS's Probate and Trust Department.Â  After graduating from law school in 1980, he
worked as an in-house landman for Getty Oil Company
before becoming self-employed in 1984 as a landman
putting oil and gas deals together.Â  In
1986, he joined a small town practice and thereafter worked at private law
firms until joining ACS.Â  





[2]This
instrument, in pertinent part, stated as follows:

Â 

NOW, THEREFORE,
Grantor, for and in consideration of Ten and no/100 Dollars and other valuable
consideration, does hereby GRANT, SELL, CONVEY, ASSIGN and DELIVER to American
Cancer Society and to Dallas Area Parkinsonism Society (together herein called "Grantee")
in equal undivided one-half interests each of the following:

Â 

A. Â Â Â Â Â Â Â  All Grantor's right, title and interest in the Property.

Â 

*Â Â Â Â Â Â Â Â Â Â  *Â Â Â Â Â Â Â Â Â Â  *

TO HAVE AND TO
HOLD the Assigned Interests unto Grantee, and their successors and assigns
forever . . . and Grantor makes no warranty of title, express or implied,
statutory or otherwise.

Â 





[3]The
lessee/grantee's interest is "determinable" because it may terminate
and revert entirely to the lessor/grantor upon occurrence of events that the
lease specifies will cause termination of the estate.Â  Natural Gas Pipeline Co. of America, 124 S.W.3d at 192 (citing W. T. Waggoner Estate, 19 S.W.2d at 28.)

Â 





[4]The
elements of negligent misrepresentation are:Â 
(1) the representation is made by the defendant in the course of his
business, or in a transaction in which he has a pecuniary interest; (2) the
defendant supplies "false information" for the guidance of others in
their business; (3) the defendant did not exercise reasonable care or
competence in obtaining or communicating the information; and (4) the plaintiff
suffers pecuniary loss by justifiably relying on the representation.Â  Federal Land Bank Ass'n v. Sloane, 825
S.W.2d 439, 442 (Tex. 1991).





[5]The
Charities cite Bartlett v. Schmidt, 33
S.W.3d 35, 38 (Tex.App.--Corpus Christi 2000, pet. denied) for the proposition
that any independent investigation by the buyer negates reliance on the
seller's representations.Â  This
proposition overstates the holding of the Bartlett
case.Â 
See Pleasant v. Bradford, 260 S.W.3d 546, 554 n.3
(Tex.App.--Austin 2008, pet. denied) ("Of
course, the [Bartlett] court was not
stating that any evidence of an investigation defeats an allegation of reliance
. . . .")Â  In Barlett, the court recognized
that any independent investigation sufficient to negate reliance would
encompass "matters covered by representations, which is sufficient to
inform him of the truth."Â  Bartlett, 33 S.W.3d at
38.Â  Moreover, "[a]lthough
the courts of appeals have articulated different tests for when a buyer's
independent inspection will defeat causation and reliance as a matter of law;
[citations omitted], the courts have consistently applied these tests such that
a buyer's independent inspection precludes a showing of causation and reliance if it reveals to the buyer the same
information that the seller allegedly failed to disclose."Â  Williams v. Dardenne, No. 01-10-00492, ___ S.W.3d___, 2011 Tex.
App. LEXIS 3849, at *19-21 (Tex.App.--Houston [1st
Dist.] May 19, 2011, pet. filed)
(collected cases cited therein) (emphasis added).Â  As already noted, here, the results of
Chesapeake's preliminary independent investigation did not reveal what the
Charities allegedly failed to disclose, i.e., lack of ownership.Â  To the contrary, the information acquired
tended to bolster the Charities alleged misrepresentations.Â Â Â Â Â