# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00532-CV

**Patricia Fish, Individually and as Executrix of the Estate of Tobey Fish, Deceased, Appellant**

**v.**

**Billie Ruth Hodges, Appellee**

### FROM THE DISTRICT COURT OF SCHLEICHER COUNTY, 51ST JUDICIAL DISTRICT
### NO. 2850A, HONORABLE MARTIN (BROCK) JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellee Billie Ruth Hodges sued appellant Patricia Fish to establish title by adverse possession to 273 acres of property that were recorded in Fish's name. A jury found that Hodges had adversely possessed the property, and the district court signed a final judgment awarding ownership of the property to Hodges. We will affirm the district court's judgment.

## BACKGROUND

In 1981, Frances Fish sold 273 acres of land on the San Saba River in Schleicher County, Texas, to her daughter, appellee Billie Ruth Hodges, and her daughter's husband, John Hodges, for $95,564. The transfer was subject to a vendor's lien, a deed of trust, and a promissory note for $85,564. Two years later, Billie Ruth and John Hodges defaulted on the promissory note and transferred ownership of the 273-acre property to Billie Ruth Hodges's brother

Tobey Fish and his wife Patricia Fish via an assumption warranty deed dated July 11, 1983.[1] The record suggests that the Hodgeses transferred the property to protect it from creditors, but Billie Ruth Hodges also claims that the plan at the time of the transfer was for the Fishes to hold the property under an oral trust benefitting the Hodgeses.

After the transfer, Billie Ruth and John Hodges retained possession of the 273-acre property and continued making the payments due under the promissory note to Frances Fish. The Hodgeses also paid the taxes for the property and made various improvements to the property, including clearing brush and building a fence around the property. After John Hodges's death in 1986, Billie Ruth Hodges retained possession of the property and continued paying the property taxes and making improvements on the property. She also claimed the property and its income on her federal income tax returns, but she did not include the property in John Hodges's estate inventory because, she explained, title to the property was in the Fishes' name. In 1993, Hodges leased grazing and hunting rights to the property, keeping the rental income for herself.

Hodges's brother Tobey Fish died in 2006, leaving all of his estate to his widow, appellant Patricia Fish. One year later, Patricia Fish listed the 273-acre property for sale for $688,500. In turn, Hodges filed this suit, asserting that she had acquired title in the property by adverse possession.[2] Patricia Fish responded with a counterclaim for trespass to real property. After the parties presented their evidence, the jury found that Billie Ruth Hodges had held the

[1] Under the terms of the assumption warranty deed, the Fishes agreed to assume liability for and pay the $85,564 promissory note in favor of Frances Fish.

[2] In addition to adverse possession, which she pleaded in the alternative, Hodges sought in her initial pleadings to establish title to the property by claiming "failure of consideration/rescission & repossession." Only the adverse-possession claim was presented to the jury.

property "in peaceable, adverse possession and cultivated, used, or enjoyed the same continuously for a period of ten (10) consecutive years between," and the district court rendered judgment awarding title to the property to Hodges. It is from this judgment that Patricia Fish now appeals.

## ANALYSIS

Patricia Fish challenges the district court's judgment in seven issues, arguing that (1) the Texas Supreme Court's decision in *Kidd v. Young*, 190 S.W.2d 65 (Tex. 1945), bars Hodges's adverse-possession claim as a matter of law; (2) Hodges's adverse-possession claim is barred because Hodges judicially admitted that the Fishes "were the legal title holders" of the 273-acre property; (3) Hodges judicially admitted that "she never excluded [the Fishes] from the Property"; (4) Hodges judicially admitted that her claim to the property was not hostile to the Fishes' claim; (5) the district court erred in submitting the adverse-possession claim to the jury because Hodges's claim was "factually invalid"; (6) the evidence supporting Hodges's adverse-possession claim was legally insufficient; and (7) in the event that this Court reverses the district court's judgment and renders judgment in Fish's favor on appeal, Fish is entitled to her attorney's fees and costs.

**Background on adverse possession**

The law on adverse possession is well established. Any person or entity who possesses a real property interest under a claim of right contrary to the rights of the owner of record, continues to possess that interest for a required time period, and meets certain other prerequisites, acquires title to the property interest by adverse possession. The civil practice and remedies code

defines adverse possession as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (West 2002). "Peaceable possession" is defined as "possession of real property that is continuous and is not interrupted by an adverse suit to recover the property." *Id.* § 16.021(3). Thus, an adverse-possession claimant must prove, by a preponderance of the evidence, (1) a visible appropriation and possession of the land, sufficient to give notice to the record title holder, that is (2) peaceable, (3) under claim of right hostile to the title holder's claim, and (4) that continues for the duration specified in the applicable statute. *See Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990). For this case, the applicable duration is ten years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.026(a) (West 2002) ("A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property.").

### Kidd v. Young

In her first issue, Fish argues that Hodges's adverse-possession claim is precluded as a matter of law because of the Texas Supreme Court's holding in *Kidd*. Under facts that are very similar to those in this case, the supreme court held in *Kidd* that grantors who continued to use and possess land after it was transferred to grantees did not acquire title of that land by adverse possession because the possession and use "was not, within itself, inconsistent and hostile to the title conveyed by the deed." *See id.*; *see also Kidd v. Young*, 185 S.W.2d 173 (Tex. Civ. App.—Amarillo 1945), *rev'd*, *id.* (setting forth additional background facts not included in supreme court's opinion). Specifically, the supreme court held that the grantors' continued possession of the property after

4

the transfer to grantees "must be regarded as subservient to the title held by their grantees." *Kidd*, 190 S.W.2d at 66.[3] This holding, Fish argues, precludes Hodges from acquiring title to the 273-acre property through adverse possession because, like the grantors in *Kidd*, Hodges's possession of the property after its transfer to the Fishes must be considered subservient to the Fishes. More specifically, Patricia Fish maintains that a person who intentionally transfers property to avoid creditors does not satisfy the hostility element of an adverse-possession claim until that person notifies the record title holder that the trust arrangement had ended. We disagree that *Kidd* precludes the jury's finding here.

The general rule of subservient possession expressed in *Kidd*—i.e., that a party holding over after the execution of a deed is merely a permissive tenant whose possession is subservient to the party holding title, *see id.*—does not preclude a claim of adverse possession if the claimant can show that he repudiated that tenancy in such a way that the titleholder was aware, or should have been aware, of the repudiation. *See Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 899 (Tex. 1976) (acknowledging *Kidd*, but noting that holdover tenant's possession can be considered adverse if "tenancy has been repudiated, and notice of such repudiation has been brought home to the titleholder"); *see also Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 194 (Tex. 2003) (citing *Tex-Wis* for general rule and its exception). Further, and important to our decision here, actual notice of the repudiation is not required; it can be inferred from "(1) long-continued possession under claim of ownership and (2) non-assertion of claim by the titleholder." *See Tex-Wis*,

---

[3] In addition to the adverse-possession claim, the supreme court disposed of the grantor's claim of oral trust by holding that the parol evidence rule barred evidence of the conversation that would have established such a parol trust. *See Kidd v. Young*, 190 S.W.2d 65, 65–66 (Tex. 1945).

534 S.W.2d at 901; *see also Pool*, 124 S.W.3d at 194 (citing *Kidd* for proposition that actual notice of repudiation is not required, it can be inferred or there can be constructive notice). In sum, a grantor who retains possession and use of the transferred land may acquire that land through adverse possession if, in addition to being open, notorious, exclusive, and inconsistent with the existence of title in others, the possession and use was of such a duration that it can be inferred that the tenancy was repudiated prior to the running of the ten-year limitation period. *See Pool*, 124 S.W.3d at 194; *Kidd*, 534 S.W.2d at 901.

In this case, there were approximately twenty-four years of potentially hostile possession after Billie Ruth and John Hodges transferred the property to the Fishes—i.e., from 1983 to the filing of this suit in 2007—which leaves fourteen years in excess of the ten-year statutory period for the jury to determine that Hodges repudiated her subservient holdover tenancy. There is evidence in the record that, during that time period, Hodges maintained open and continuous possession inconsistent with title in others. For example, there is evidence that she used the land, built and maintained the fences around the land, placed locks on gates, leased the land for grazing and hunting, keeping the money for herself, granted permission for entry onto the land, and paid the taxes on the land. There is also evidence that the Fishes never asserted any claim over the property during this time period. In fact, more than one witness testified that Tobey Fish repeatedly denied ownership of the property over the years. From this evidence, the jury could have reasonably inferred that Hodges repudiated the holdover tenancy and claimed the property for herself during the first fourteen years after 1983. *See Kidd*, 534 S.W.3d at 901. Accordingly, we overrule Fish's first issue.

6

**Hodges's alleged judicial admissions**

In her second, third, and fourth issues, Fish argues that Hodges is barred from claiming title through adverse possession because Hodges made judicial admissions that the Fishes (1) "were the legal title holders" of the 273-acre property, (2) Hodges "never excluded [the Fishes] from the Property," and (3) Hodges's claim to the property was not hostile to the Fishes. We disagree.

A judicial admission is "a formal waiver of proof usually found in pleadings or the stipulations of the parties." *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980). "A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and it bars the admitting party from disputing it." *See id.* (citing *Gevinson v. Manhattan Constr. Co. of Okla.*, 449 S.W.2d 458, 467 (Tex. 1969)); *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (holding that judicial admission occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings or evidence unnecessary). A judicial admission should be distinguished from a "quasi-admission," which is a party's testimonial declaration that is contrary to the party's position. *See id.* Quasi-admissions are "merely some evidence, and they are not conclusive upon the admitter." *Id.* (citing *Harris Cnty. v. Hall*, 172 S.W.2d 691, 694–95 (Tex. 1943)). The trier of fact must decide what weight to give quasi-admissions. A party's testimonial quasi-admission will preclude recovery—i.e., be considered a judicial admission—however, if it meets the following requirements: (1) the statement was made during a judicial proceeding; (2) the statement was contrary to an essential fact or defense asserted by the

7

party; (3) the statement was deliberate, clear, and unequivocal; (4) the statement was not destructive of the opposing party's theory of recovery or defense; and (5) enforcing the statement as a judicial admission would be consistent with public policy. *See id.* (citing *Griffin v. Superior Ins. Co.*, 338 S.W.2d 415, 419 (Tex. 1960); *Kaplan v. Kaplan*, 129 S.W.3d 666, 669 (Tex. App.—Fort Worth 2004, pet. denied); *Tex-Wis Co.*, 534 S.W.2d at 903.

### *Record title holders*

At various times between 1983 and the present, including in the trial of this matter, Hodges acknowledged that title to the 273-acre property was in the Fishes' names, that the Fishes were "the owners of record" of the property, that title to the property was not in her or her husband's names, and that the Fishes had "legal title" to the property. Patricia Fish also points to Hodges's omission of the 273-acre property from John Hodges's estate inventory, which Billie Ruth Hodges created and presented to the probate court. Fish maintains that these statements and omission by Hodges are judicial admissions that bar Hodges from claiming that she has title to the property by adverse possession. We disagree.

Even assuming that at least one of these statements or omission meets all the requirements for judicial admissions set forth above, *see Mendoza*, 606 S.W.2d at 694 (setting forth requirements to deem quasi-admissions judicial admissions), they would only preclude Billie Ruth Hodges from claiming that she holds title in her name, that she's the owner of record, or that she has legal title to the property. But making a claim to title through adverse possession necessarily means that the claimant cannot make these assertions. In fact, an adverse-possession claim requires the claimant to show a visible appropriation and possession of the land, sufficient to give notice *to the*

8

*record title holder*, that is peaceable, under claim of right hostile to the title holder's claim, and that continues for the duration specified in the applicable statute. *See Rhodes*, 802 S.W.2d at 645. Stated another way, Billie Ruth Hodges would have no need to claim title to the property through adverse possession if record title to the property was in her name. Further, the cases to which Patricia Fish cites do not support her argument here. *See Bruni v. Vidaurri*, 166 S.W.2d 81 (Tex. 1942); *Warren v. Fredericks*, 18 S.W. 750 (Tex. 1892). First, *Bruni* involved a claimant's recognition of the title holder's *ownership* of the property, not just the title. *See Bruni*, 166 S.W.2d at 88. In fact, the adverse-possession claimant in *Bruni* had offered to purchase the property in issue from the record title holder and the supreme court held that type of acknowledgment was a bar to adverse possession because it showed that the claimant knew that the title holder's claim to the property was superior to the claimant's. *See id.* That is substantively different from merely acknowledging that title to the property is in another's name. As to *Warren*, Patricia Fish cites to it for the statement "'a single lisp of acknowledgment by the defendant that he claims no title fastens a character upon his possession, which makes it unavailable for ages.'" *See Warren*, 18 S.W. at 752 (quoting *Colvin v. Burnet*, 17 Wend. 564, 568–69 (N.Y. Sup. Ct. (1837)). But the "lisp of acknowledgment" in both *Warren* and *Colvin*, as shown by the quotation itself, was that the claimant asserted no interest to the land. *See Warren*, 18 S.W. at 752; *Colvin*, 17 Wend. at 569. In this case, Hodges testified that she has always claimed ownership of the 273-acre property.

To the extent that Patricia Fish is arguing that these statements by Billie Ruth Hodges constitute a quasi-admission that every type of title, including title through adverse possession, is in the Fishes' name, we would note that the statements in the record before us are not "deliberate,

9

clear, and unequivocal" such that we could deem them to be judicial admissions that Billie Ruth Hodges had not possessed the property under a claim of right that was contrary to the Fishes' rights for at least ten years. *See Mendoza*, 606 S.W.2d at 694. Likewise, Billie Ruth Hodges's failure, whether deliberate or not, to include the 273-acre property on John Hodges's probate inventory in 1986 was not a "deliberate, clear, and unequivocal" statement that she was not, and would never, possess the 273-acre property under a claim of right contrary to the rights of the owner of record for the statutory period. *See Rhodes*, 802 S.W.2d at 645.

### *Exclusive*

Patricia Fish makes a similar judicial-admission argument regarding Billie Ruth Hodges's statements at trial that she never "excluded" the Fishes or other people from the property. Specifically, Patricia Fish argues that because Hodges never "excluded" the Fishes from the 273-acre property, she has failed to meet the exclusivity requirement of adverse possession. We find this argument unpersuasive.

In the adverse-possession context, "exclusive" refers to the exclusivity of the ownership being asserted—i.e., the possession of the land must "'indicate unmistakably an assertion of a claim of exclusive ownership in the occupant.'" *See Rhodes*, 802 S.W.2d at 645 (quoting *Satterwhite v. Rosser*, 61 Tex. 166, 1884 WL 8738, at *4 (Tex. 1884)). For example, an adverse-possession claimant who builds a garage or a driveway over the landowner's property or a claimant who builds and maintains fences to enclose another's property is exerting an exclusive ownership *in himself* that is hostile to the landowner. *See Tran v. Macha*, 213 S.W.3d 913, 914 (Tex. 2006) (garage, driveway); *McDonnold v. Weinacht*, 465 S.W.2d 136, 141 (Tex. 1971) (fence). Conversely,

10

a claimant who *shares* a strip of land with his neighbor landowner will not succeed on an adverse-possession claim because that type of shared use is not "inconsistent with or hostile"—i.e., exclusive of—the landowner's ownership. *See Tran*, 213 S.W.3d at 914 (noting that "when a landowner and the claimant of an easement both use the same way, the use by the claimant is not exclusive of the owner's use and therefore will not be considered adverse").

The testimonial example to which Fish refers in support of her argument does not show that Hodges's possession of the property was not exclusive. At most, it illustrates a lay person's misunderstanding of "exclusive" in the adverse-possession context:

Q: My question—I'm sorry. My question is a little different. Did you ever exclude your brother from this property?

A: That's really hard to answer because—I guess I did in a way because it was locked most of the time. So that would be an exclusion. But if he had ever asked me, if Tobey had a reason to go on the property and had asked for combinations to the gates and stuff, I would not—I would have not told him "no."

Q: Well, that lock didn't apply to your brother who you loved like a dad, did it? If he had got over the fence and been out there, you wouldn't have had any problem with it at all, would you?

A: No, not that I know of.

Q: You never told Tobey, "You can't come to this ranch," did you?

A: No, I didn't.

Q: Never sent him a letter saying, "You can't come to the ranch," did you?

A: No.

Q: Never told his wife that she couldn't come to the ranch, did you?

11

A:       No.

Q:       No exclusion whatsoever, right?

A:       I never excluded other people either, though.

In fact, it can be fairly inferred from this and other evidence in the record that Hodges, by putting a fence up, locking the gates, and giving people permission, including the Fishes, to enter the property, was asserting a claim of ownership exclusive to her.  *See id.*; *Rhodes*, 802 S.W.2d at 645.

### *Hostile*

In her final judicial-admission issue, Patricia Fish argues that Billie Ruth Hodges's assertions that the Fishes held the property in trust for her is a judicial admission that conclusively establishes that her possession of the 273-acre property was not hostile to the Fishes's ownership. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (defining "adverse possession" as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."); *see also Black's Law Dictionary* 1282 (9th ed. 2009) (defining "hostile possession" as "[p]ossession asserted against the claims of all others, esp. the record owner").  We disagree.

Patricia Fish bases her argument here on the following cross-examination testimony of Billie Ruth Hodges:

Q:       But what I'm trying to figure out is what your intent was.  Be it his partners or himself, your intent was to make sure everybody out there, any creditor out there or potential creditor, knew that this property was Tobey and Patricia Fish's?

A:     The intent was to protect the property for John and I until we had things taken care of and there wasn't a threat to the property—to losing the property. You're right.

. . . .

Q:     Okay. Now, it wasn't—what it was, this deal was, the property was going to get transferred to your brother and your sister-in-law, and then they were going to have legal title, ownership; and then, once the creditors are out of the way and there's no risk there, you can approach them and they will transfer it back to you? That's the deal, right?

A:     Yes.

. . . .

Q:     [W]hen you initially sued your brother's estate, you were—your belief was that he was acting as some kind of trustee; is that correct?

A:     Yes.

Q:     Under an oral trust?

A:     Yes.

Q:     You still believe that, don't you, ma'am?

A:     Yes, I do.

Q:     You didn't take her property by adverse possession, did you?

A:     I don't know what you mean by—I mean, if—if he had ever made an attempt to take that property, I would have certainly made steps to correct it. I had—I had the note that said we had superior title. We had had possession of the land. We used it. I paid the taxes on it. You know, he knew it was mine, I knew it was mine, Patty knew it was mine; so I did not need to take it. But had he—had he tried to take the land, it would have certainly been adverse possession.

Q:     You believe he would have been committing adverse possession?

13

A: Well, I don't understand it well enough that—I did not take it by—I mean, it was mine. I didn't take it.

Q: Fair enough, ma'am. And that's why when you initially sued your brother's estate and your sister-in-law you just said it was an oral trust that he broke, correct?

A: He didn't break the trust.

Q: You believe she did?

A: Yes.

Q: You never sued him under a vendor's lien—as a matter of fact, when you sued his estate and her, you didn't say anything about violating a vendor's lien, did you?

A: No.

Q: That only came up way after this, correct, after your lawsuit?

A: I think it was after everything had been examined, yes.

We would note first that part of this exchange involves references to a claim that Billie Ruth Hodges asserted in her initial pleadings—i.e., her claim that the Fishes held the property in a constructive trust—but later dropped. That trust claim was made in the alternative to her other claims, including adverse possession, and, as such, is not a judicial admission. *See Riner v. Neumann*, 353 S.W.3d 312, 320 (Tex. App.—Dallas 2011, no pet.) (holding that a claim made in the alternative is not a judicial admission.). More importantly, however, answering on cross-examination that she thought, and still thinks, that the Fishes were holding the property in trust for her is not, especially in light of the fact that she dropped that claim and appears confused by the questions from opposing counsel, a "deliberate, clear, and unequivocal" factual statement that is contrary to her position that she

14

acquired title to the property by adverse possession. *See Tex-Wis Co.*, 534 S.W.2d at 903 (taking into consideration advanced age of witness in determining that her testimony was not judicial admission). Finally, we would also note that much of the above exchange involves what the parties' intentions were when they transferred the property in 1983, but the relationship or arrangement that existed in 1983 could have been, as we noted in our discussion of *Kidd*, later repudiated. *See Tex-Wis Co.*, 534 S.W.2d at 899 (acknowledging *Kidd*, but noting that holdover tenant's possession can be considered adverse if "tenancy has been repudiated, and notice of such repudiation has been brought home to the titleholder"). To that extent, Hodges's testimony here is not dispositive.

We overrule Patricia Fish's second, third, and fourth issues.

**Jury question on adverse possession**

Fish's fifth issue, which challenges the district court's submission of an adverse-possession question to the jury, is closely related to her second issue regarding Hodges's admissions that title to the property was in the Fishes' name. Specifically, Fish argues in this issue that it was error to submit an adverse-possession question to the jury because Hodges judicially admitted that title to the 273-acre property was in the Fishes' names, that the Fishes were "the owners of record" of the property, that title to the property was not in Hodges's name, and that the Fishes had "legal title" to the property. Because we cannot distinguish this argument from the one she makes in her second issue, our holding there is dispositive of this issue, and accordingly, we overrule Fish's fifth issue for the same reasons.

15

**Sufficiency of the evidence**

In her sixth issue, Fish challenges the sufficiency of the evidence supporting the jury's finding that Hodges adversely possessed the property at issue here. Specifically, Patricia Fish argues that there is no evidence that Hodges's possession of the 273-acre property was hostile to the Fishes' title in the property and exclusive to Hodges. *See Rhodes*, 802 S.W.3d at 645 (setting forth elements of adverse possession, including possession that is "hostile" to others and "exclusive" to the claimant). An assertion that there is no evidence to support a jury's finding on a vital fact is a challenge to the legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005) (providing that court must sustain legal-sufficiency complaint if the record shows that there is a complete absence of evidence of a vital fact). Accordingly, although Fish frames her issue in a way that may suggest a challenge to the factual sufficiency, we will limit our review to the legal sufficiency of the evidence.[4] *See Lundy v. Masson*, 260 S.W.3d 482, 502 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (limiting review to legal sufficiency because appellant argued only that there was no evidence of vital fact).

In a legal-sufficiency challenge, we review the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. Moreover, we

---

[4] Patricia Fish's paragraph heading for this issue states that "The jury verdict is clearly wrong and manifestly unjust," which refers to a factual-sufficiency standard, *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (holding that, in factual-sufficiency determination, court should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust), but the body of her paragraph alleges only that there is no evidence of hostile and exclusive possession.

16

must indulge every reasonable inference that would support the district court's findings. *Id*. at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

In an adverse-possession context, "hostile" means "adverse," and refers to an intention to claim property as one's own because such a claim is, by its very nature, hostile or adverse to another's claim on the same property. *See Rhodes*, 802 S.W.2d at 645; *Black's Law Dictionary* 1282 (defining "hostile possession" as "[p]ossession asserted against the claims of all others, esp. the record owner"). Similarly, the "exclusivity" factor of adverse possession also relates to a claim of ownership, but in the context of the claimant: the claimant's possession must be "of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership in the" claimant. *See Rhodes*, 802 S.W.2d at 645.

Here, the record shows that Hodges was in possession of the 273-acre property from 1981 to 2007. In fact, Hodges testified that she had been in exclusive possession of the property since 1981 when her mother sold it to her and John Hodges. Additionally, there is evidence that, during that time, Hodges did the following things:

- Paid all the taxes on the 273-acre property;
- Continued to make payments on the note;
- Reported income from the property on her federal income tax returns;
- Built and maintained a fence around the property;
- Locked the gate to the property;
- Cleared brush from the property;
- Drilled a well on the property;
- Made improvements to the property;
- Leased out grazing rights and hunting rights for the property;
- Placed "no trespassing" signs on the property;

17

- Gave permission to the county to remove gravel from the property; and
- Gave permission to others to enter the property for various purposes.

In addition, there was testimony from a lessor of the hunting rights that he thought that Hodges owned the property and that he never saw either of the Fishes on the property. Also, several individuals testified that when they approached Tobey Fish about the property, he would say that Billie Ruth Hodges owned the property. We hold that this evidence would enable reasonable and fair-minded people to determine that Billie Ruth Hodges's possession of the 273-acre property was adverse to the Fishes' claim in that property and was exclusive to herself. Accordingly, we overrule Patricia Fish's sixth issue.

Our resolution of Fish's first six issues renders it unnecessary to address her final issue, which requests an award of attorney's fees in the event we reverse and render in her favor.

**CONCLUSION**

Having overruled Patricia Fish's issues on appeal, we affirm the district court's judgment.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed: July 12, 2012

18