# Supreme Court of Texas

---

No. 24-0881

---

In the Interest of K.N., K.L., K.L., and K.L., Children

---

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

---

JUSTICE BLAND, joined by Justice Lehrmann and Justice Huddle, dissenting in part.

Father witnessed and participated in his wife's abuse of a child. He did not visit his children for over a year and refused to take steps toward reunification. He engaged in a high-speed police chase while possessing four grams of methamphetamine, knowing his parental rights were in jeopardy. He failed to provide a clean drug test. A jury heard this evidence along with his testimony attempting to justify his actions. The jury terminated Father's rights, finding endangerment and constructive abandonment.

The Court analogizes this case to *In re H.S.*,[1] noting that both "illustrate the legal standards governing evidentiary-sufficiency challenges to parental-termination orders."[2] As in *H.S.*, the Court in this

---

[1] ___ S.W.3d ___, 2026 WL ___ (Tex. June 5, 2026).

[2] *Ante* at 1.

case "disregards considerable evidence supporting the jury's verdict and, in doing so, fails to properly defer to the jury's role as factfinder."[3] The Court compounds its error by refusing to consider whether the evidence supports the jury's finding of constructive abandonment, delaying permanency for these children into another year.

As the Court holds, the evidence supports termination of Mother's rights. I join that part of its opinion. A proper review requires upholding termination as to Father, too. Because the Court does not, I respectfully dissent in part to the Court's judgment.

# I

It is important to provide the complete picture of the evidence as to Father. Mother and Father share three children: Kimberly, Kayla, and Keith.[4] Though they do not share Mother's eldest child, Karen, Father has been in her life since before she turned one and has "always taken her as [his] daughter."

The January 2021 investigation focused primarily on reports of Mother's abuse of Karen, but it also revealed Father's concerning behavior at the time. The investigator reported that Father was present during many incidents between Mother and Karen. Mother and Father each acknowledged that Father was aware of, and sometimes took part in, Mother's extreme disciplinary methods. Father's conversations with Department employees demonstrated recognition of the gravity of those incidents. Yet Father told school officials that the children were not

---

[3] *H.S.*, ___ S.W.3d ___ (Lehrmann, J., dissenting).

[4] The pseudonyms for the children are those the Court uses. *See* Tex. R. App. P. 9.8(b)(2).

permitted to speak with the Department.

The next investigation began after Karen's outcry that Mother "grabs and drags [her] by her hair when she doesn't listen." Father concedes he was present during this incident. Father allowed an investigator to view the children, but he advised that he and Mother would not cooperate with the Department. Conversations with Mother's family members intensified concerns for the children. Mother's own mother and sister witnessed Father's complicity in Mother's abuse and testified against both parents at trial. The children's maternal grandmother testified that "[Karen] was treated differently" and faced "[e]xcessive" discipline. When she raised concerns with Mother and Father, Mother would "deny . . . access to the kids." The grandmother testified that Father "knew what was going on" and promised to "try to make things better." Likewise, Mother's sister testified to the differential treatment of Karen, noting that she "got the brunt end of the deal." She witnessed marks on Karen's neck resulting from an "altercation" with Mother. She, too, testified that Father and the other children in the house knew that Mother abused Karen. When she tried to talk to Father about the abuse, he responded that "at least it was [Karen] and not him getting in trouble."

The following school year, Mother and Father failed to enroll the children. Upon further investigation, including interviews with the children's maternal aunt and grandmother, the Department sought to terminate Mother's and Father's parental rights. The trial court ordered the children's temporary removal pending further proceedings. Mother and Father refused to comply with the court order, instead fleeing to

3

Louisiana with the children.[5] They did not enroll the children in school once there. Eventually, the children were taken into care and placed with their maternal grandparents.

Upon entering care, the children's caseworker noticed possible developmental delays in Kimberly, Kayla, and Keith. Grandmother testified that Kayla, then age five, had eleven cavities requiring general anesthesia to treat. Kimberly and Kayla needed glasses. Karen had warts "all over her hands, and beginning to move to her lips." Kimberly had an undiagnosed seizure while in the care of her parents.

As the maternal grandparents worked to remedy these issues, Mother and Father chose to remain in Louisiana. The Department provided a service plan. Father refused to participate, including declining to visit the children from December 2022 to February 2023, at which time the Court suspended visitation for his failure to engage. Father justified his absence by telling the jury that the Department was "going to take [his] information" to "use it against [him] to terminate [his] rights later."

In January 2023, Louisiana police initiated a traffic stop against Father. Father led officers on a twelve-to-fifteen mile chase at speeds of over 130 miles per hour. The chase ended when Father wrecked his motorcycle. Police apprehended him as he fled on foot. Officers discovered four grams of methamphetamine on Father's person. The State of Louisiana charged him with three felonies: aggravated flight

---

[5] It is unclear whether the move occurred before or after the hearing. Mother testified that they moved the month before, but Father testified that he was still working in Texas when the hearing occurred.

from an officer; reckless operation of a motorcycle; and possession of a schedule II substance.

In August 2023, the parties entered into a mediated settlement agreement to resume visitation conditioned upon negative drug screenings of both parents. Father never provided a negative screening, instead testing positive for amphetamines on two separate occasions. Father claimed the findings resulted from prescribed medication, but he refused to permit the Department to verify a prescription. In total, Father did not see his children for over a year—from their removal in November 2022 through the December 2023 trial.

The jury found that Father had endangered the children, constructively abandoned the children, and failed to comply with a court order establishing the actions necessary for reunification with the children.[6] The jury further found that termination was in the children's best interest,[7] a finding Father does not challenge. The court of appeals affirmed on the endangerment grounds without reaching the other statutory grounds that could support the judgment.[8] The Court declines to review the evidence that supports these alternative grounds.[9]

## II

"A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude."[10] "But '[j]ust as it is imperative

---

[6] Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O).

[7] *Id.* § 161.001(b)(2).

[8] 719 S.W.3d 388, 396, 398 (Tex. App.—Amarillo 2024).

[9] *Ante* at 35.

[10] *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022).

5

for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.'"[11]

In reviewing the legal sufficiency of termination findings, we "must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof."[12] This heightened standard of review "does not dispel, however, the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility."[13] Thus, we "'look at all the evidence in the light most favorable to the finding,' 'assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' and 'disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible'" without disregarding "'undisputed facts that do not support the finding.'"[14] In doing so, we "honor not only the elevated burden of proof, but also the deference an appellate court must have for the factfinder's role."[15]

In its review, the Court disregards evidence that Father contributed to the abuse in the home. Further, it isolates other evidence

---

[11] *In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013) (alteration in original) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

[12] *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

[13] *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021).

[14] *J.W.*, 645 S.W.3d at 741 (quoting *J.F.C.*, 96 S.W.3d at 266).

[15] *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

supporting termination as though each action must individually support a termination finding, rather than viewing the evidence as forming a collective pattern of endangerment that the jury reasonably could have credited.

## A

The Court discounts Father's role in the abuse of Karen, stating that "the record does not show that [Father] himself abused [Karen] in the same ways that led to Mother's termination."[16] Father testified, however, that he knew of Mother's actions and took part in some of them. The Court's characterization of this as a view they disagree with[17] does not change that the jury heard Father's admissions. In the litany of evidence the Court recites to support termination of Mother's rights, *Father* was the perpetrator of the "painful punishments involving kneeling on rice"; he was involved in forcing her to "stand[] at a wall for extended periods"; and he admitted he was present when Karen was "dragged by her hair."[18] As the Court recognizes, "the jury heard competent evidence of . . . ongoing instances of physical abuse, emotional abuse and food deprivation."[19] The jury also heard that Father either participated in, witnessed, or was aware of all of it.

Texas recognizes that the difference between reasonable corporal punishment and criminal abuse depends on facts specific to the child

---

[16] *Ante* at 29.

[17] *Id.* at 29 n.4.

[18] *Id.* at 23.

[19] *Id.*

7

and the circumstances.[20] In this case, the trial court instructed the jury on a parent's statutory right to reasonable discipline. The jury resolved that Father exceeded the limit.

Such a determination was within its province. First, witnessing and participating in the abuse of his stepdaughter is evidence the jury could credit to find endangerment. Father considered leaving with the children because of Mother's behavior, but "it never panned out." The children's maternal aunt testified that, after she voiced concerns about Karen's treatment, Father said, "at least it was [Karen] and not him getting in trouble." Father saw Mother abusing Karen—a child whom he testified as seeing "no other way" but as his daughter—and did not attempt to end it. As the Court highlights in its discussion of Mother: "Karen was beaten and bruised, repeatedly, for years, in incidents reported by many witnesses who told the jury such violence exceeded the limits of traditional discipline."[21] Father stood there while it happened.

A parent's conduct toward other children is relevant to whether a parent has endangered a child.[22] Evidence of an adult permitting child abuse in his home is relevant to whether that adult endangered other

---

[20] *See Stanfield v. State*, 43 Tex. 167, 168 (1875).

[21] *Ante* at 23.

[22] *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (reaffirming that "endangering conduct is not limited to actions directed towards the child" and can include actions occurring "while the parent had custody of older children").

children.[23] In evaluating abuse and neglect under Chapter 262, a factfinder may "examine a parent's history with other children as a factor of the risks or threats of the environment" because "[p]art of [the] calculus" of the finding "includes the harm suffered or the danger faced by other children under the parent's care."[24] The Legislature similarly recognizes as much by making termination of parental rights as to one child on endangerment grounds an independent ground for termination of rights as to other children.[25]

"The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry."[26] Thus, a father's knowledge of a mother's failure to protect their unborn child "can contribute to an endangering environment and thus support an endangerment finding."[27] Though this Court does not "endorse attributing any and all known dangers posed to a child . . . to the other parent," we nevertheless recognize that disregarding a father's knowledge of abuse "would effectively endorse [his] willful ignorance of the significant risk."[28]

---

[23] *See* Tex. Fam. Code § 261.001(5)(C) (including "a person with whom the child's parent cohabits" in the definition of "[p]erson responsible for a child's care, custody, or welfare" in the child abuse context).

[24] *In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014) (second alteration in original) (quoting *E.C.R.*, 402 S.W.3d at 248) (discussing Tex. Fam. Code §§ 262.001–.417).

[25] Tex. Fam. Code § 161.001(b)(1)(M).

[26] *J.W.*, 645 S.W.3d at 749.

[27] *Id.* at 749–50.

[28] *Id.* at 750.

9

Second, Mother's abuse is relevant to Father's case because his children resided in an abusive household—a condition endangering to the other children's emotional well-being.[29] "[P]roximity to wrongdoing"[30] is relevant when that wrongdoing injures a child, and Father's conduct need not be directed at a child to endanger that child.[31] The younger three children witnessed the abuse Mother inflicted. The maternal aunt and grandmother testified that the other children reported that Karen was not allowed to eat with the family. A court-appointed advocate testified that Kimberly had been "indoctrinated or trained" to watch Karen and report misbehavior to Mother. Father did nothing to shield his children from witnessing abuse. Though he "did not need to solve everything on [his] own," he had "to do the best [he] could to insulate [his] children from" Mother's behavior.[32]

Setting aside Karen's abuse and the effect it had on the other children, the jury heard evidence that the children were neglected in Father's care. "[N]eglect can be just as dangerous to the well-being of a

---

[29] Tex. Fam. Code § 161.001(b)(1)(D), (E); *see also J.F.C.*, 96 S.W.3d at 271–72 (considering evidence of abuse of a sibling as relevant to termination of a parent's rights to other children); *see also In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("A parent's abuse of a child endangers that child but also endangers other children the parent may have in his care." (citing *E.C.R.*, 402 S.W.3d at 248)).

[30] *Ante* at 30.

[31] *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]t is not necessary that the conduct be directed at the child or that the child actually suffers injury.").

[32] *H.S.*, ___ S.W.3d ___ (Lehrmann, J., dissenting).

child as direct physical abuse."[33] When the children arrived at their grandmother's, Kimberly had eleven cavities and had suffered an undiagnosed seizure, and Kayla and Kimberly both needed glasses. A caseworker noticed developmental delays in all three children, and Father had not enrolled them in school. The Court credits this evidence against Mother,[34] but Father also bore responsibility to care for his children's physical needs.

**B**

The jury chose the Department as the permanent managing conservator and Mother as a possessory conservator of the three younger children while terminating Father's rights. Evidence of Father's post-removal actions harmonizes the difference in the jury's verdicts as to Mother and Father. The Court silos Father's post-removal behavior into categories, disregarding the weight of the cumulative evidence against Father.

As a preliminary matter, the Court's declaration that "[o]ur precedents have cast doubt on the extent to which *post-removal* conduct informs the Paragraph (D) and (E) endangerment predicates" gravely distorts our endangerment precedent.[35] The Court relies on *In re J.W.* to make this contention, but there we expressly declined to hold "that a parent could never cause his child to be placed in an endangering environment after removal" because we could not "foreclose the possibility that Subsection (D) could apply post-removal depending on

---

[33] *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996).

[34] *See ante* at 27.

[35] *Id.* at 31 n.5.

the facts."[36] Similarly, the Court points to *In re C.E.*[37] as "identifying the 'relevant timeframe' for endangering conduct under Paragraph (E) as the time when the parent was the child's caregiver, before the child was removed."[38] To the contrary, the Court in *C.E.* referred to the mother's post-removal conduct as evidence the jury could credit.[39] *C.E.* imposes no time limit on endangering-conduct evidence.

Rather, our precedent evaluates evidence during the pendency of the suit to inform endangerment findings, especially evidence that "shows a course of conduct which has the effect of endangering" the child.[40] For example, while describing the father's course of conduct that "permitted a reasonable factfinder to find endangerment" in *In re J.O.A.*, we noted that the father "missed multiple drug tests *after the children's removal*" and tested positive for marijuana shortly before the final hearing in the case.[41] Similarly, in *In re A.V.*,[42] we held the evidence "show[ed] a pattern of *continued* substantial risk of harm to the child sufficient to support a trial court's finding of endangerment," noting that the parents' drug use was ongoing despite knowledge that "their

---

[36] 645 S.W.3d at 749 n.12.

[37] 687 S.W.3d 304 (Tex. 2024).

[38] *Ante* at 31 n.5 (quoting *C.E.*, 687 S.W.3d at 307).

[39] *See* 687 S.W.3d at 313–14 (referencing the caseworker's concerns about the mother's inappropriate conduct with the infant during supervised visits).

[40] *Boyd*, 727 S.W.2d at 534.

[41] *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024) (emphasis added) (discussing *J.O.A.*, 283 S.W.3d at 346).

[42] 697 S.W.3d 657 (Tex. 2024).

parental rights were subject to termination for continued drug use."[43]

After removal, the Department's first priority is to reunify the family except in aggravated circumstances.[44] The trial court cannot terminate without a showing that "a continuing danger remains in the home that prevents the return of the child to the parent."[45] It thus is proper and at times imperative to consider post-removal conduct in evaluating the evidence supporting an endangerment ground.

Turning to the evidence, the jury heard that Father led law enforcement officials on a high-speed chase with four grams of methamphetamine in his pocket, resulting in three felony charges. For context, possession of four grams of methamphetamine in Texas is a second-degree felony carrying a potential prison sentence of between two and twenty years and a fine of up to $10,000.[46] Then, Father twice tested positive for amphetamines and refused to permit the Department to verify a prescription he claimed he had for the drug. Father never submitted a clean drug test. The jury, as "the sole judge[] of the credibility of the witnesses and the weight to give their testimony,"[47] heard Father's excuse for his positive tests and could disbelieve it, particularly when combined with evidence of a 2017 incident

---

[43] *Id.* at 659 (emphasis added); *see also H.S.*, ___ S.W.3d ___ (Lehrmann, J., dissenting) (pointing to evidence of a mother's post-removal drug use as supporting the endangerment finding).

[44] Tex. Fam. Code §§ 161.001(f)(1), 262.2015(a).

[45] *Id.* § 161.001(f)(1).

[46] Tex. Health & Safety Code §§ 481.102(6), .115(d); Tex. Penal Code § 12.33.

[47] *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

13

culminating in Father's guilty verdicts for possession of a dangerous drug and theft of a firearm.[48] While his parental rights hung in the balance, Father chanced incarceration, knowing it "risked separating him from" his children "for years."[49] Father's drug use in the face of Mother's abusive behavior is "particularly concerning" because it rendered him less capable of protecting the children upon reunification.[50]

While embroiled in this destructive behavior, Father did not attempt to visit his children for over a year. This is abandonment. Though Subsection (N) creates an independent statutory ground for termination on the basis of constructive abandonment,[51] we have recognized that "[t]he grounds for termination are not mutually exclusive; rather, the same conduct may support multiple grounds and a finding that termination of a parent's rights is in the child's best interest."[52] In recognizing abandonment as an independent ground, the Legislature has determined that the gravity of such harm can alone result in termination in certain circumstances. Nothing bars a factfinder

---

[48] *See J.O.A.*, 283 S.W.3d at 346 (noting the "probative value of a long history of drug use and irresponsible choices" when identifying an endangering course of conduct).

[49] *J.F.-G.*, 627 S.W.3d at 315.

[50] *See H.S.*, ___ S.W.3d ___ (Lehrmann, J., dissenting) ("This evidence is particularly concerning because of the impact that drugs would necessarily have on Mother's ability to take action to protect the children under such circumstances.").

[51] Tex. Fam. Code § 161.001(b)(1)(N).

[52] *J.F.-G.*, 627 S.W.3d at 314.

from considering abandonment evidence to support an endangerment finding.[53] In *In re J.F.-G.*, we declined to accept that incarceration alone is endangering.[54] We nonetheless held it was relevant to the endangerment inquiry "when the resulting abandonment presents a risk, as it did here, to a child's physical or emotional well-being."[55] The father's absence there "exposed [the child] to physical and emotional loss, as he did not care for, nurture, or protect her."[56] Though evidence of abandonment may not, alone, be sufficient to prove endangerment, the jury could have credited it together with the other evidence it heard.

The Court asserts that neither Father's "isolated criminal misconduct," nor his failed drug tests, nor his abandonment, standing alone, support termination.[57] A reasonable factfinder, however, could link Father's drug use with his dangerous and felonious conduct, the abandonment of his children, and his pre-removal neglect to conclude that Father's conduct "establish[ed] a substantial *risk* of harm" to the younger children.[58]

The Court scoffs that this evidence "does not establish that Father 'used illegal drugs in a manner that created a substantial risk of harm

---

[53] *See A.V.*, 697 S.W.3d at 659 (observing that the parents' sporadic visitation and failure to complete their services was some evidence supporting an endangerment finding).

[54] 627 S.W.3d at 315.

[55] *Id.*

[56] *Id.*

[57] *See ante* at 30–34.

[58] *R.R.A.*, 687 S.W.3d at 278.

15

to his children' sufficient to support the termination of parental rights."[59] Unlike the Court, the jury was persuaded. "It remains the jury's 'responsibility to weigh evidence, draw inferences, and evaluate witness credibility.'"[60] Because legally sufficient evidence supports the verdict, we should uphold the jury's finding that Father allowed his children to remain in an endangering environment and engaged in conduct that endangered them.[61]

### III

Appellate courts should consider alternative grounds for rendition before ordering a remand.[62] Interests of judicial economy require that a court render "a judgment moving the case to the greatest degree of finality."[63] The Court nevertheless declines to reach ground (N), an alternative basis for affirming the judgment before it.[64]

The Court should not needlessly delay a parental termination case, where "[f]inality is uniquely important."[65] "[C]hildren's lives

---

[59] *Ante* at 33 (quoting *R.R.A.*, 687 S.W.3d at 272).

[60] *H.S.*, ___ S.W.3d ___ (Lehrmann, J., dissenting) (quoting *J.W.*, 645 S.W.3d at 745).

[61] Tex. Fam. Code § 161.001(b)(1)(D), (E).

[62] *See FieldTurf USA, Inc. v. Pleasant Grove Indep. Sch. Dist.*, 642 S.W.3d 829, 836 (Tex. 2022).

[63] *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003).

[64] Earlier this term, we held that a court of appeals that took a similar "shortcut" by remanding without considering alternative bases for rendition committed "reversible error in itself." *Valk v. Copper Creek Distribs., Inc.*, ___ S.W.3d ___, 2026 WL 1041612, at *1 (Tex. Apr. 17, 2026).

[65] *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020).

cannot be 'kept in limbo while judicial processes crawl forward.'[66] A "child's best interest is inherently threatened by undue uncertainty and delay in finally determining where the child will live and who will raise [the child]."[67] We should reach potentially dispositive issues in such cases, resolving the permanency question for these children.

To that end, the jury heard legally sufficient evidence to support its finding of constructive abandonment.[68] Father primarily contends the Department failed to make efforts toward reunification after his relocation to Louisiana. On the contrary, the caseworker reached out each month trying to engage the parents in services and repeatedly notified them that failure to participate could result in termination. The parents rebuffed these efforts. Contrary to his argument on appeal,

---

[66] *Id.* (quoting *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003)); *see also B.L.D.*, 113 S.W.3d at 353 (stating that "judicial economy is not just a policy—it is a statutory mandate" in parental termination cases); Tex. Fam. Code § 109.002(a-1) (giving appeals from terminations of parental rights precedence over other civil appeals); Tex. R. App. P. 28.4(a)(1) (identifying appeals in parental termination cases as governed by the rules for accelerated appeals).

[67] *In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017).

[68] Family Code Section 161.001(b)(1)(N) requires a finding that the parent has:

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
> (i) the department has made reasonable efforts to return the child to the parent;
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
> (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

17

Father testified that his failure was due to privacy concerns, not a lack of effort from the Department.

The evidence supports the other elements of (N), too, including lack of regular visitation or significant contact for the requisite six months. Father failed to exercise visitation before it was suspended for his failure to see the children and participate in services. Once the parties reached an agreement to resume visitation, Father would not provide the required negative drug screening despite agreeing to do so.

The evidence also demonstrates Father's inability to provide a safe environment. He refused to provide the Department with a Louisiana address or proof of income. Because "[t]he grounds for termination are not mutually exclusive" and "the same conduct may support multiple grounds,"[69] the evidence supporting the endangerment ground also bears on the safe-environment element, including Father's criminal activity, drug abuse, and complicity in child abuse.

*      *      *

---

[69] *J.F.-G.*, 627 S.W.3d at 314.

18

As the Court observes, "The jury heard live testimony from fifteen witnesses . . . and spent nearly eight hours deliberating."[70] We should defer to the jury's credibility determinations because legally sufficient evidence supports its findings as to Father. Failing that, we should examine and decide the merit of the independent bases supporting the trial court's judgment. As the Court does not, I respectfully dissent in part.

Jane N. Bland
Justice

**OPINION FILED:** June 5, 2026

---

[70] *Ante* at 8.